**Mrs. Jane DOE, individually and on behalf of her minor dependent child, Scott, and in behalf of all others similarly situated**

v.

**Bernard SHAPIRO, Commissioner of Welfare, State of Connecticut:**

**Civ. No. 13093.**

United States District Court
D. Connecticut.

Aug. 4, 1969.

Thomas Jay Solomon, Waterbury Legal Aid & Reference Service, Inc., Waterbury, Conn. (Lee A. Albert, Sylvia A. Law, Nancy Duff Levy, New York City, and Joel Levine, Waterbury, Conn., of counsel), for plaintiffs.

Francis J. Macgregor, Asst. Atty. Gen., Hartford, Conn., for defendant.

Before SMITH, Circuit Judge, and BLUMENFELD and CLARIE, District Judges.

## MEMORANDUM OF DECISION

J. JOSEPH SMITH, Circuit Judge:

This is a class action attacking the validity of a regulation of the Connecticut State Welfare Department which pro-

vides for the termination of welfare payments to illegitimate children in cases where the mother will not disclose the name of the child's father.[1] The action was brought under 42 U.S.C. § 1983 by Mrs. Jane Doe,[2] individually and on behalf of her infant son Scott, as representatives of that class of persons who are concededly "needy" and "dependent" within the meaning of the Aid to Families with Dependent Children (AFDC) program of the Social Security Act, 42 U.S.C. §§ 601–610, but who are ineligible for AFDC assistance on account of the challenged regulation.[3] The defendant, Bernard Shapiro, is Commissioner of the Connecticut State Welfare Department. In January, 1969, the state welfare authorities terminated AFDC payments to Scott because Mrs. Doe would not divulge the name of Scott's father.

In their complaint plaintiffs sought various kinds of declaratory and injunctive relief, including the retroactive payment of AFDC benefits wrongfully withheld by the state. Because the constitutional questions presented were not insubstantial, and because the complaint sought an injunction restraining the enforcement, operation, and execution of a statewide regulation on the ground of its unconstitutionality, a three-judge court was convened. 28 U.S.C. §§ 2281, 2284. Our jurisdiction is based on 28 U.S.C. §§ 1343(3) and (4).

At the outset we believe that we can narrow the issues somewhat by indicating what this case is not about. Contrary to what plaintiffs say, this is not a case where the state has made invidious distinctions on the basis of legitimacy or illegitimacy of birth. Scott Doe has not been barred from the welfare rolls because of his illegitimacy, but because his mother would not divulge his father's name, and indeed, there are thousands of needy illegitimate children in Connecticut who are presently receiving AFDC payments from the Connecticut State Welfare Department. Any attempt to analogize this case to either Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968), or Glona v. American Guarantee & Liability Insurance Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968), must therefore fail.

The narrow question presented, then, is whether the state can require the mother of an illegitimate child to divulge the name of the child's father as a condition for AFDC eligibility. Plaintiffs argue that the challenged regulation violates the Equal Protection Clause of the Fourteenth Amendment because it arbitrarily creates two classes of needy illegitimate children indistinguishable from each other except for the obstinacy of their mothers. A needy child, it is urged, is no less needy because the state is unable to learn the name of his father, and thus we are asked to conclude that the challenged regulation is "utterly lacking in rational justification." Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). The state, in response, insists that it has a valid interest in obtaining reimbursement from financially able fathers, and that such a procedure is specifically sanctioned by 42 U.S.C. § 602(a) (17) (A) (i).

---

1. Vol. I, Chapter III, § P–3460.1(2) (b) of the Connecticut Handbook of Social Service Policies provides as follows:

    "If the mother is not able to name the father, or if she refuses to name him, she is advised that:

    \*　　\*　　\*　　\*　　\*

    (b) If she wishes assistance for the child it is necessary to have a court determination of paternity and amount of support."

2. Because of the special circumstances of this case, plaintiffs sue under fictitious names.

3. This is properly a class action under Rule 23, Fed.R.Civ.P., since the requirements of Rule 23(a) are met, and since "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23 (b) (2), Fed.R.Civ.P. The class consists of all those illegitimate children who are otherwise eligible for AFDC assistance but who have been deprived of such assistance on account of the challenged regulation.

Plaintiffs next argue that compliance with the challenged regulation would create a serious self-incrimination dilemma for the mother, since she could reasonably fear that such information might provide a basis for a criminal prosecution for either fornication, lascivious carriage, or possibly adultery.[4] At the very least it is urged that the name of the father would furnish a "link in a chain of facts" leading to a criminal prosecution of the mother. Hoffman v. United States, 341 U.S. 479, 488, 71 S.Ct. 814, 819, 95 L.Ed. 1118 (1950). To show that the risk of prosecution is not altogether fanciful, compare Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), plaintiffs point to State v. Plummer, 5 Conn.Cir. 35, 241 A.2d 198 (1967), where a prosecution for lascivious carriage was brought on the basis of information provided by the state welfare authorities. The defendant, in reply, answers that a welfare mother in such a situation is afforded complete immunity under Conn. Gen.Stat. § 52–435b, which provides in pertinent part that "[t]he mother of any child for whom adjudication of paternity is sought in paternity proceedings shall not * * * be prosecuted for any criminal act about which she testifies in connection with such proceedings."

While Conn.Gen.Stat. § 52–435b unquestionably gives immunity to statements made in the paternity proceeding itself, there is some question as to whether its immunity extends to involuntary statements made out of court prior to the paternity proceeding. The scope of the immunity statute is important, of course, since under the rule laid down in Murphy

v. Waterfront Commission, 378 U.S. 52, 78–79, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), an individual may not be compelled to give inculpatory information unless "the compelled testimony and its fruits" cannot be used in any criminal prosecution against him. The state suggests that the words "in connection with such proceedings" are susceptible of an interpretation which would afford full immunity, and further suggests that out-of-court statements made prior to the paternity proceeding would be privileged under Conn.Gen.Stat. § 17–83(b), which provides:

> "No person shall, except for purposes directly connected with the administration of this chapter and in accordance with the regulations of the commissioner, solicit, disclose, receive or make use of, or authorize, knowingly permit, participate in or acquiesce in the use of, any list of the names of, or any information concerning, persons applying for or receiving assistance under this chapter, directly or indirectly derived from the records, papers, files or communications of the state or its subdivisions or agencies, or acquired in the course of the performance of official duties."

This statute, the state tells us, should be construed in light of the congressional mandate that states participating in the AFDC program must "provide safeguards which restrict the use or disclosure of information concerning applicants and recipients to purposes directly connected with the administration of aid to families with dependent children." 42 U.S.C. § 602(a) (9). Cf. In re Cager, 251 Md. 473, 248 A.2d 384 (1968).[5]

---

4. The relevant criminal statutes are Conn. Gen.Stat. § 53–218 (adultery) and § 53–219 (fornication and lascivious carriage).

5. The state also argues that if the threat to reduce or terminate welfare assistance is coercive within the meaning of the Fifth Amendment, cf. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), and if incriminating statements are obtained by means of such threats, then the Fifth Amendment

would be a complete defense to a criminal prosecution based on such statements. The state would thus analogize this case to Adams v. Maryland, 347 U.S. 179, 181, 74 S.Ct. 442, 445, 98 L.Ed. 608 (1954), where Mr. Justice Black said: "[A] witness does not need any statute to protect him from the use of self-incriminating testimony he is compelled to give over his objection. The Fifth Amendment takes care of that without a statute." In other words, the state would have us impose

In addition to attacking the challenged regulation on constitutional grounds, plaintiffs insist that the regulation is fatally inconsistent with the statutory requirement that "aid shall be promptly furnished to all eligible individuals." 42 U.S.C. § 602(a)(10). They urge that the basic purpose of the AFDC program is to provide financial assistance to needy children who are deprived of the support and care of one of their parents, and that the only eligibility requirements imposed by Congress are that the child be "needy" and "dependent." Plaintiffs argue that Connecticut has created an additional eligibility requirement by conditioning the availability of AFDC assistance on the mother's willingness to divulge the name of the father, and contend that such an eligibility requirement is as repugnant to the AFDC program as the "substitute father" regulation struck down in King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L. Ed.2d 1118 (1968).

■ Although the state argues with considerable force that the Social Security Act requires it to take affirmative steps to ascertain paternity in the case of illegitimate children receiving AFDC assistance, we do not think that 42 U.S.C. § 602(a)(17)(A)(i) was ever intended to allow a state to disqualify an otherwise eligible child on the basis of its mother's refusal to name the father, and we do not think that a close reading of that provision will support the interpretation urged by the state. We hold, therefore, that the challenged regulation is invalid on the ground that it imposes an additional condition of eligibility not required by the Social Security Act. Since we hold the challenged regulation invalid on statutory grounds, we do not reach the constitutional isues raised by plaintiffs. See King v. Smith, *supra*; Solman v. Shapiro, 300 F.Supp. 409 (D. Conn.1969).

Under the Social Security Act, a child is eligible for and entitled to AFDC assistance if he is both "needy" and "dependent." A child is "needy" if he "does not have the income and resources sufficient to assure economic security" when measured against standards of need established by the individual states. HEW, Handbook of Public Assistance, Part IV, § 3120. A child is "dependent" if a parent is continually absent from the home. 42 U.S.C. § 606(a).[6] These are the only two eligibility requirements which Congress has imposed, and there can be no doubt that Scott Doe satisfies both. He is without any means of support and is hence "needy." He is "dependent" because his father has been continually absent from the home.

An adjudication of paternity establishes only that there is a legal duty of support; it does not necessarily establish that support will be forthcoming from the absent but now legally liable father. Since the child would still remain eligible for AFDC assistance if the legally liable father refused or was unable to provide support, we must conclude that the name of the child's father is absolutely irrelevant to the question of AFDC eligibility.

restrictions on the use of testimony obtained as a result of threats to terminate AFDC assistance. Cf. Murphy v. Waterfront Commission, *supra*. The state would distinguish such cases as Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), on the ground that "[t]he terms of the wagering tax system make quite plain that Congress intended information obtained as a consequence of registration and payment of the occupational tax to be provided to interested prosecuting authorities." *Id.* at 58–59, 88 S.Ct. at 708. In contrast, it is urged that the principal purpose of the challenged regulation is to relieve the state of the financial burden of supporting illegitimate children by pursuing financially able fathers. It is also urged that no welfare mother has ever been criminally prosecuted in Connecticut on the basis of information obtained by the state welfare authorities prior to a paternity proceeding. Cf. Poe v. Ullman, *supra*.

6. A child may also be considered "dependent" if he is "deprived of parental support or care by reason of the unemployment * * * of his father," even if the father is not absent from the home. 42 U.S.C. § 607(a).

While Congress has said that state plans must make provision for establishing paternity and obtaining support from absent fathers, it simply does not follow from this that Congress intended to leave the needy child without any means of subsistence if the mother was unwilling to name the father. Indeed, if Congress had intended so drastic a result, there is good reason to suppose that it would have made its intent more explicit. The same Congress had no difficulty, for example, in making it abundantly clear that certain welfare recipients could be required to participate in "work incentive" programs if they wished to remain eligible for AFDC assistance. 42 U.S.C. § 602 (a) (19). In contrast, 42 U.S.C. § 602 (a) (17) (A) (i) says absolutely nothing about eligibility requirements. Moreover, 42 U.S.C. § 602(a) (19) provides that if an individual refuses to participate in such a program, the state may disregard the needs of that individual in computing the amount of AFDC assistance to be paid to his family, *but it must continue the family on the welfare rolls.* By a parity of reasoning, we think that the one thing the state may not do in the case of the non-cooperating mother is terminate AFDC assistance to her concededly eligible child.

By its very language 42 U.S.C. § 602 (a) (17) (A) provides only that state plans must take steps to develop and implement a program

"(i) in the case of a child born out of wedlock who is receiving aid to families with dependent children, *to establish the paternity of such child and secure support for him,* and

(ii) in the case of any child receiving such aid who has been deserted or abandoned by his parent, to secure support for such child from such parent (or from any other person legally liable for such support) * * *." [Italics added.]

As the legislative history makes plain, Congress was concerned with the problems of child abandonment and nonsupport when it enacted 42 U.S.C. § 602 (a) (17) (A). Its concern grew out of the fact that "[a] substantial portion of the persons receiving aid under the AFDC program are eligible because of the desertion by a parent of the child," S.Rep. No. 744, 90th Cong., 1st Sess. (1967), reprinted in 1967 U.S.Code Cong. and Admin. News, pp. 2834, 2997, and thus Congress proposed that the states should undertake an "increased effort to enforce the laws against desertion and nonsupport." Id. at 2998.

The 1967 amendments were thus intended to supersede an earlier provision of the Social Security Act, 42 U.S.C. § 602(a) (11), added by ch. 809, § 321 (b), 64 Stat. 549 (1950), which required only that states give "prompt notice" to appropriate law enforcement officials "in respect of a child who has been deserted or abandoned by a parent." The difficulty with this provision, which was known as Notice to Law Enforcement Officials (NOLEO), was that it was not "broad enough" to secure support from the absent parent "in every possible case." H.R.Rep. No. 544, 90th Cong., 1st Sess., 100 (1967). It did not, for example, produce sufficient cooperation between state welfare and law enforcement officials. Nor did it take into account the costs of locating absent parents and enforcing support orders. See S. Rep. No. 744, 90th Cong., 1st Sess. (1967), reprinted in 1967 U.S.Code Cong. and Admin. News, pp. 2834, 2997–2998.

To remedy the inadequacies of the NOLEO provision, Congress proposed that the states be given "additional tools * * * to assure the determination of legal responsibility for support and to make efforts to make these collections." *Id.* at 2997. These "additional tools" included the establishment of a full-time separate unit within the state welfare agency to deal with the problem of obtaining support from absent parents, 42 U.S.C. § 602(a) (17) (B), as well as the utilization of reciprocal support arrangements with other states to enforce support orders for deserted children, 42 U.S.C. § 602(a) (17) (A) (ii). Congress also provided that federal funds would be made available to assist state welfare

authorities in their efforts to locate absent parents and secure support. All of these provisions were intended "to make certain that all legally responsible parents of sufficient means make their appropriate contribution to the support of their children." S.Rep. No. 744, 90th Cong., 1st Sess. (1967), reprinted in 1967 U.S.Code Cong. and Admin.News, pp. 2834, 2997.

In addition, the 1967 amendments added a provision to cover the case of the abandoned illegitimate child who was receiving AFDC benefits. The earlier NOLEO provision did not make any specific provision for securing support from the absent father of an illegitimate child, although such a child was arguably within the NOLEO definition of "a child who has been deserted or abandoned by a parent." In the case of an abandoned illegitimate child, the state cannot, of course, secure support from an absent father without first establishing the paternity of such child, and thus it would seem that 42 U.S.C. § 602(a) (17) (A) (i) simply makes explicit what the earlier NOLEO provision had implied. This provision does not, in so many words, make AFDC eligibility depend on the mother's willingness to name the father, and as we read the legislative history, we do not think that Congress intended to penalize the child for his mother's refusal to cooperate with state welfare authorities. Our conclusion is supported by the application regulations of the

Department of Health, Education and Welfare, which state that the original NOLEO provision did not make the state welfare agency responsible

"for requiring the applicant to take action against the deserting parent or for making eligibility for assistance conditioned upon action by the applicant. * * * The public assistance job is seen as that of providing eligible children with the assistance they need; and it is not the intent of the legislation to deprive needy children of assistance in order to punish their parents for neglect of their duties. Although accepting assistance involves notice to the law enforcement officials if a parent has deserted or abandoned his child, *the amendment does not impose an additional eligibility requirement.* This is clear in the wording of the provision which · requires that *aid has been furnished* in respect of a child who has been deserted or abandoned by a parent." HEW, Handbook of Public Assistance Administration. Part IV, § 8120, [Italics added.]

■ There is nothing in the legislative history to show that Congress has repudiated the position taken in the earlier HEW regulations, and the new regulations give absolutely no indication that HEW has construed 42 U.S.C. § 602 (a) (17) (A) (i) to create an additional eligibility requirement.[7] This is highly

---

7. The HEW regulations promulgated pursuant to 42 U.S.C. § 602(a) (17) (A) (i) are set out at 45 C.F.R. § 220.48, 34 Fed. Reg. 1359 (1969):

"(a) There must be a program for establishing paternity for children born out-of-wedlock and for securing financial support for them and for all other children receiving AFDC who have been deserted by their parents or other legally liable persons. Efforts must be made to locate putative and absent parents and there must be a determination of their potential to provide financial support. There must be provision for the utilization of reciprocal arrangements with other states to obtain or enforce court orders for support. There must be a single staff unit in the state agency

and in large local agencies to administer this program. (The files of the Social Security Administration are available to the state agencies when other efforts have failed to provide the necessary information on the address of a parent.)

(b) There must be a plan of cooperation with courts and law enforcement officials and pertinent information must be provided them when their assistance is needed in locating putative or deserting fathers, establishing paternity and securing support.

*       *       *       *       *

(d) There must be cooperation with other state welfare agencies administering AFDC in locating parents of an AFDC child against whom a support petition has been filed in another state

significant, of course, because the construction of a statute by those charged with administering it is entitled to great weight. See Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (June 9, 1969); Udall v. Tallman, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

As we observed earlier, the focus of 42 U.S.C. § 602(a) (17) (A) (i) is on programs for establishing paternity and locating absent fathers. Its principal justification was that it would result in the savings of welfare costs to the state. Such savings were expected to result from recoupment of welfare funds already expended, not by wholesale purges of the welfare rolls. Certainly Congress would not have spoken in terms of *a child currently receiving AFDC assistance* ("a child born out of wedlock who is receiving aid to families with dependent children") if it did not think that the child was already eligible. Indeed, if the child is ineligible for AFDC assistance, the recoupment rationale makes no sense. We conclude, therefore, that the statutory language assumes the continued eligibility of the child, regardless of the cooperation of the child's mother in efforts to establish paternity and locate the absent father.

Our conclusion is also confirmed by the remarks of Representative Wilbur Mills, chairman of the House Ways and Means Committee, during the floor debates on the 1967 amendments. At one point he said:

"Are you satisfied with the fact that illegitimacy in this country is rising and rising and rising? I am not. We have tried to encourage the states to develop programs to do something about it. Now we are requiring them

to do something about it. *We are not penalizing any child. We are not going to take a child off the rolls in any state nor fail to participate with federal funds in the case of that child, regardless of what his parent does.* But we are not going to continue to put federal funds into states for the benefit of parents when they refuse to get out of that house and try to earn something." 113 Cong.Rec. 23043 (1967). [Italics added.]

While it may be that the italicized words refer to the mother's immorality rather than her refusal to divulge the name of the child's father, they do indicate a reluctance on the part of Congress to terminate AFDC assistance to otherwise eligible children. Moreover, Representative Mills' remarks suggest that if any sanctions are to be applied in the case of the non-cooperating mother, those sanctions should be directed at the mother and not at the needy child.

■ We do not doubt that the state may have valid interests in establishing paternity and locating absent fathers, and indeed, there may well be instances where divulgence of the father's name would be of substantial benefit to the child.[8] However compelling these interests may be, Congress has determined that the primary and inescapable obligation of participating states is to provide financial assistance to "needy" and "dependent" children. The "protection of such children is the paramount goal of AFDC." King v. Smith, *supra*, 392 U.S. at 325, 88 S.Ct. at 2137.

Since the challenged regulation is inconsistent with the congressional directive that AFDC assistance be "promptly furnished to all eligible individuals," 42 U.S.C. § 602(a) (9), the regulation is void

---

and in attempting to secure compliance by a state.

(e) Clearance procedures established with the Internal Revenue Service will be used in respect to any parents of AFDC children whose location is unknown and who are failing to comply with existing court orders for support payments or against whom petitions for orders have been filed. * * * "

8. An illegitimate child presumably would not be entitled to receive OASDI payments, for example, if his father never acknowledged paternity. See 42 U.S.C. § 416(h) (3). The result would probably be the same in the case of veterans benefits. See 42 U.S.C. § 417.

and may no longer be enforced. Accordingly, it is ordered that the defendant be permanently enjoined from discontinuing or denying AFDC assistance to said plaintiffs on the ground that they are barred from receiving such assistance under Vol. I, Chapter III, § P–3460.1(2) (b) of the Connecticut Handbook of Social Service Policies. Since Connecticut welfare regulations provide a procedure whereby retroactive entitlement to payments wrongfully withheld may be determined, the question of retroactive damages is remanded to the Connecticut State Welfare Department for its determination in light of this decision and the applicable regulations of the United States Department of Health, Education and Welfare and the Connecticut State Welfare Department. See Solman v. Shapiro, *supra*.

The above shall serve as the Findings of Fact and Conclusions of Law required by Rule 52(a), Fed.R.Civ.P.

CLARIE, District Judge (dissenting):

I respectfully dissent; I would deny the permanent injunction and dismiss the plaintiff's claims. The Connecticut Welfare regulation under attack, § 3460.1(2) (b),[1] neither conflicts with the federal social security act nor is it unconstitutional. The plaintiff summarily alleges that the aforesaid state regulation is contrary to and incompatible with the Federal Act for the reasons that: (1) aid may not be suspended under the doctrine of King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); (2) HEW's NOLEO regulations, more particularly § 8120, prohibits the State from terminating aid and (3) the Federal Act establishes only two eligibility requirements, need and dependence, and Connecticut is without authorization to add to either.

State Regulation § 3460.1(2) (b) was made and promulgated pursuant to statutory authority, Conn.Gen.Stat. § 17–83 (a). It was designed to synchronize with the federal law, and establish a program, which had as its objective, providing aid to needy families with dependent children. Title 42 U.S.C. § 601 defines the federal statutory objectives:

"For the purpose of encouraging the care of dependent children in their own homes * * * to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection * * *."

The act provides that the paternity of dependent children born out of wedlock be established; and it requires that each state design a federally acceptable procedure to accomplish this purpose. 42 U.S.C. § 602(a) (17). Subparagraph § 602(a) (15) (A) (ii) encourages the establishment of a program to prevent or reduce the incidence of births out of wedlock and to otherwise strengthen family life.

The focal statutory provision which has application here is § 602(a) (7); it reads in part:

"(A State plan for aid and services to needy families with children must) * * * provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, or of any other individual (living in the same home as such child and relative) whose needs the State determines should be considered in determining the need of the child or relative claiming such aid, as well as any expenses reasonably attributable to the earning of any such income."

It is fundamental in this statutory scheme, that the sources of all family income be disclosed as a prerequisite to an applicant's qualifying for eligibility benefits. Thus the mother's disclosure of the known identity of a legally liable

---

[1]. "If she wishes assistance for the child it is necessary to have a court determination of paternity and amount of support."

putative father is certainly an essential element in correctly evaluating the applicant-mother's support capabilities, as stated on the application in behalf of herself and her dependent children. Her limited disclosure of actual current income is incomplete, if any of the available sources remain unrevealed.

She is the actual party plaintiff in this action; it is to her that the government welfare benefits are directly paid. It is through her, that the family unit is sought to be preserved, as an essential unit of our society. She is the actual recipient of these moneys as head of the household. It is the plan and expectation, that her maternal interest as natural parent and guardian will assure to the dependent child the full benefits of the government allotment.

Unless the principle of personal parental responsibility is to be abandoned, as an obsolete cornerstone for gauging welfare eligibility, a full disclosure is a necessary and implied governmental prerogative, which requires the applicant to disclose all relevant information. Absent this personal responsibility and cooperativeness between the applicant-mother and the government, the effectiveness of the program would be seriously challenged because she is the sole source of this information; and without it the system designed to establish paternity could not function. See James v. Goldberg, D.C., 302 F.Supp. 478 (June 13, 1969).

This case is readily distinguishable from King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). The Court found there that Alabama's eligibility regulations disqualified otherwise eligible dependent children under the Act and were arbitrary and discriminatory. That state's regulations wrongfully classified a quasi-substitute father, as being responsible for the sup-port of a child, when the state's own support laws said he was not legally liable. The eligibility conditions of that regulation not only denied benefits to the mother and the new-born child, whose parentage was in question, but it also arbitrarily deprived all other eligible dependent children in the family from benefiting under the A.D.C. program. The Court ruled that the federal welfare act could not be used to curb illegitimacy or to discourage the mother's promiscuous conduct; and that the regulations were not only unrelated to, but in conflict with the overall purpose of the Federal Act.

This case, on the other hand, is only concerned with minimal disclosure requirements, which have always been universally recognized as an integral and traditional part of the welfare program. The state is not denying benefits to a dependent child, because of the mother's misconduct or for other moral purposes. The mother-applicant's refusal to disclose a known source of potential family income, in this instance that of the putative father, simply deprives eligibility to that particular child for which the information on the application is deficient.

The plaintiff's argument leans heavily for support on the federal NOLEO regulations, especially § 8120. However, the relevance of the language in § 8120 is sharply reduced when § 8149 is considered.[2] Section 8149 does not prohibit but merely advises against benefits being withheld, until after the actual commencement of a support action against the putative father. This recommendation does not preclude or condemn Connecticut's rule, which insists upon a simple disclosure of the father's identity.

In fact the HEW administrative office has already formally placed its stamp of

---

2. Section 8149 provides:

"The Bureau advises against (state) legislation that makes the actual commencement of action on the part of a parent to obtain support from the parent who has deserted or abandoned his children a con-dition of eligibility. Such provisions deprive needy children, who would otherwise be eligible, of the right to receive aid to dependent children pending the commencement of action to obtain support from the absent parent."

approval upon this Connecticut regulation. It said:

> "We do not believe that a state agency can delay the determination of eligibility and payment pending the operation of its program to establish paternity, *except* in the case of a mother who refuses to cooperate with the agency in the matter of establishing paternity." [3]

This interpretation is of practical significance when one considers that the policy was formulated after the administrative problems had been sifted through many years of accumulated experience and professionally acquired expertise.

In construing a federal statute, courts are required to give great weight to the statutory construction of the agency entrusted to administer it.

> "And here this principle is given special force by the equally venerable principle that the construction of a statute by those charged with its execution should be followed, unless there are compelling indications that it is wrong * * *. Zemel v. Rusk, 381 U.S. 1, 11–12, 85 S.Ct. 1271, 1278–1279, 14 L.Ed.2d 179 (1965); Udall v. Tallman, 380 U.S. 1, 16–18, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965)." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801–1802, 23 L.Ed.2d 371 (June 9, 1969).

The basic tenet of the plaintiff's position is that Congress has established only two eligibility requirements, need and dependence, and that the state may not add to this list under any circumstances. There is no basis for this position where, as in § 602(a) (17), Congress is silent on the issue.

AFDC is a system of cooperative federalism, wherein both the states and the federal government contribute substantial sums of money, to be administered locally by an agency of the state. The state is required to enact statutes and supplement them with regulations that will implement the system and make it administratively operable. In keeping with this plan and absent explicit Congressional prohibition the state is entitled to adopt reasonable regulations. Connecticut's regulation which is now under attack, meets this standard and upholds the overall philosophy and purpose of the law. § 602(a) (17).

Congress created this system which requires only the identity of the father, to allow enforcement officials with the assistance of the Internal Revenue Service and the Social Security files, to locate an absconding father. It is one of the very few occasions when the information in those records is statutorily made available for use outside the agencies' official business. Could it be that Congress contemplated this elaborate system would be paralyzed by an uncooperative applicant-mother who could still successfully insist that she be paid her full monetary allotment?

If need and dependence were the only eligibility requirements necessary to qualify under the Act, there would have been no need for the United States Supreme Court in its recent decision in Shapiro v. Thompson to rely on constitutional issues. There, the court found: "On its face, the statute does not approve, much less prescribe a one year requirement." (394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600). State residence requirements are of course totally unrelated to either need or dependence and constitute an additional eligibility requirement. Therefore, if the Supreme Court subscribed to plaintiff's arguments, the residency requirements would simply have been contrary to the statute and the Court would have followed its traditional rule of not deciding constitutional issues, when statutory issues suffice. In *Thompson*, the Court decided the case on constitutional issues, just as this Court must reach and decide the constitutional issues here.

3. Letter 11/8/68 Associate Reg. Comm'r for Assistance Payments to Comm'r.

Bernard Shapiro, Conn. Welfare Dept. filed 6/13/69.

## Constitutional Issues

The only substantial constitutional question to be resolved is whether the state regulation violates the plaintiff's fifth amendment privilege against self-incrimination. Plaintiff's supplemental assertion that the regulation violates the right to equal protection under the federal constitution, is frivolous. The regulation does not create two classes of children—one characterized as legitimate, the other—illegitimate. Nor does it improperly create two classes of illegitimate children—those receiving and those not receiving aid. It is universally recognized that it is permissible for a state to classify into groups, provided there is a rationale and reasonable reason for doing so. The State's interest here in recouping and reducing welfare support expenditures by *obtaining* contribution from a legally liable parent is not only justifiable financially in the orderly process of government, but it is essential, if the state is to be eligible to participate in the federal program. 42 U.S.C. § 602 (a) (17).

This is not the same situation described in Shapiro v. Thompson, *supra,* where the state was accused of interfering with the constitutional right to travel. The Court ruled that "a compelling state interest" was first required to be shown, to justify a restriction on a basic constitutional right. Welfare is certainly not a basic constitutional right. See also Conn.Gen.Stat. § 17–100. It is best described as a support allotment created by statute. Once established, the government must not discriminate against any person or group in its administration, in violation of the equal protection clause of the federal Constitution. The state regulation in question was designed to effectively administrate welfare within the framework of federal and state law; it is neither arbitrary nor discriminatory in respect to this plaintiff or her dependent child beneficiary.

The plaintiff-mother claims that her fifth amendment rights against self-incrimination have been invaded. She contends that the state terminated the ADC payments which should be paid to her for the benefit of said child, because she, as the mother, refused to disclose the identity of the known putative father. She claimed that this disclosure could result in her criminal prosecution. If the situation were ever to arise, which is highly unlikely, that a criminal action was commenced, arising out of her disclosure of the name of the putative father, the existing law assures her of complete immunity from prosecution. See In re Cager, 251 Md. 473, 248 A.2d 384 (Mary.Ct.App.1968). It is clearly established, that if the plaintiff testified in any actual paternity court proceedings, state law unequivocally grants her absolute immunity. Conn.Gen.Stat. § 52–435b. The real issue is whether her confidential disclosure to the Welfare Department might lead, even remotely, to her subsequent criminal prosecution. In re Cager, *supra,* held that under both state and federal law, such information could not be used in any manner as a basis for criminal prosecution. The Maryland confidentiality statute was construed to be an absolute defense against such a possibility and the Connecticut statute, § 17–83 is essentially the same. Both statutes limit the *direct and indirect use* of information submitted to the Department, to purposes *directly* connected with the administration of the welfare program. Furthermore, as an additional safeguard, Connecticut specifically makes it a crime for any one connected with the administration of the act to disclose this information. § 17–83b. Thus, criminal prosecution, as feared by plaintiff, cannot possibly arise out of or be related to plaintiff's disclosure under the ADC welfare program.

Any improper use of such information, as *Cager* held, is also prohibited by the federal welfare confidentiality statute. 42 U.S.C. § 602(a) (9). It establishes an overlapping federal defense, which surmounts any arguable theoretical gap in the Connecticut law. Consequently, plaintiff's fifth amendment privilege has not been infringed.