**CATHOLIC MEDICAL CENTER OF BROOKLYN AND QUEENS INC., DIVISION OF ST. MARY'S HOSPITAL; the Niagara Falls Memorial Hospital; and other hospitals similarly situated, Plaintiffs,**

v.

**Nelson A. ROCKEFELLER, Governor of the State of New York; Hollis S. Ingraham, Commissioner of Health of the State of New York; George K. Wyman, Commissioner of Social Services of the State of New York; and T. Norman Hurd, Director of the Budget of the State of New York, Defendants.**

**No. 69-C-641.**

United States District Court
E. D. New York.
Oct. 21, 1969.

Harris, Beach & Wilcox, Rochester, N. Y., for plaintiffs; by James M. Hartman, Rochester, N. Y., of counsel.

Louis J. Lefkowitz, Atty. Gen., State of New York, for defendants; by George

D. Zuckerman, Asst. Atty. Gen., of counsel.

INTERIM MEMORANDUM

Before FRIENDLY, Circuit Judge, MISHLER and JUDD, District Judges.

JUDD, District Judge.

This case presents another aspect of the involvement of Federal courts in the expanding responsibility of government for areas of health and welfare which were previously occupied largely by private charity.

### The Basic Issue

The basic issue is whether the charitable hospitals of New York have valid objections, under either the Constitution or the Social Security Act, to a 1969 New York statute temporarily freezing the rates for inpatient hospital services provided to Medicaid patients regardless of the actual reasonable costs of such services.

For the reasons hereinafter stated, we are deferring a decision until the United States Secretary of Health, Education and Welfare has an opportunity to express his views.

### The Basic Statutes

1. The provisions of the Social Security Act involved in this case are contained in Title XIX, which makes sums available to states which are operating under state plans for medical assistance to the medically indigent that have been approved by the Secretary of Health, Education and Welfare. 42 U.S.C. § 1396. Inpatient hospital services constitutes one of the types of care and services which may be included in approved state plans under 42 U.S.C. § 1396a(a) (13) (C), and 42 U.S.C. § 1396d(a) (1)—and must be included with respect to families with dependent children and the aged, blind and disabled who lack income and resources. 42 U.S.C. § 1396a(a) (13) (B).

The requirement of payment for hospital services offered under a state plan is contained in 42 U.S.C. § 1396a(a) (13) (D), which states that the state plan must provide:

"(D) for payment of the reasonable cost (as determined in accordance with standards approved by the Secretary and included in the plan) of inpatient hospital services provided under the plan;"

Hospital costs are also dealt with in the Handbook of Public Assistance Administration (Supplement D) prepared by the Department of Health, Education and Welfare (H.E.W.) which states (D–5362) that state plans for medical assistance

"must provide that:

"1. the State agency will pay the reasonable cost of inpatient hospital services provided under the plan."

Adjustments must be made of rates for reimbursement of current reasonable costs either by annual retroactive adjustments or, in states where this is not feasible, by adjusting current payments "in the light of anticipated current reasonable costs * * * as nearly as they can be estimated in advance." D–5364.3.

2. The 1969 New York statute which is under current attack modifies a plan of payment for hospital services which was previously provided by statute and regulation. The duty to submit a plan for medical assistance under Title XIX of the Social Security Act was imposed on the New York Department of Social Welfare (now Social Services) in 1966 (Social Services Law, McKinney's Consol. Laws, c. 55, § 363–a). Only one copy of the plan as approved by H.E.W. is in existence in New York State, but it is undisputed that the plan provided for the state to furnish inpatient hospital services. The duty to determine rate schedules for payments to hospitals, and to certify those rates to the Director of the Budget, was imposed upon the Commissioner of Health, by Section 2807 of the New York Public Health Law, McKinney's Consol.Laws, c. 45.

The method of making hospital rate determinations is specified in Section

770.1 of the State Hospital Code, adopted by the State Hospital Review and Planning Council. Section 770.1(b) provides that:

"Hospital inpatient rates shall be individually determined for each hospital, be related to the reasonable cost of providing services to patients, be established on an all-inclusive basis for hospital service, be computed as an average daily cost of providing inpatient care, and be no greater than posted charges."

Detailed directions are given for what elements of cost shall be included in the rate computation and what shall be excluded. To comply with the requirement of the Federal regulation that current payments be adjusted in the light of anticipated current reasonable costs (D–5364.3b), the state regulation provides that:

"(6) The per patient day cost of care shall be adjusted to reflect current costs by multiplying such cost of care by one and one-half times the lesser of the following:

"(i) the percent rate of change computed for each hospital by the use of a three-year moving average; or

"(ii) 15 percent above the three-year moving average percent rate of change for the group and classification of the hospital;"

A purpose to obtain conformity between state practices and the requirements of Title XIX of the Social Security Act is expressed in the final paragraph of Section 770.1 of the Hospital Code, which states:

"(g) The methods of determining rates for care in hospitals specified in this section and the rates certified pursuant thereto shall be consistent with the requirements of, and subject to such adjustments by the commissioner as may be required by, the Federal Secretary of Health, Education and Welfare pursuant to the provisions of Titles V and XIX of the Social Security Act to the extent required to reasonably assure that fed-

eral reimbursement for such care and service is not impaired."

The 1969 amendment under attack in this proceeding added a proviso that "rates of payment for hospital and health-related service made by government agencies, approved by the state director of the budget and in effect March thirty-first, nineteen hundred sixty-nine shall continue in effect for the period ending December thirty-first, nineteen hundred sixty-nine." L.1969, Chs. 184, 957, amending Pub.Health L. § 2807(2).

### The Posture of the Present Action

By the amended complaint in this action two hospitals, claiming to act on behalf of other hospitals similarly situated, seek a declaratory judgment that the 1969 New York statute described above is unconstitutional either because of its conflict with the Federal statute and regulations (first cause of action), or because it is unconstitutionally vague and therefore contravenes the due process clause of the Fourteenth Amendment to the United States Constitution (second cause of action). They also allege that their property is taken without due process of law because two new statutes (L. 1969, Chs. 419, 672) mandate the treatment of emergency cases, and the freeze statute compels them to render services in such cases below the reasonable cost (third cause of action). Defendants' answer puts in issue the basic allegations of the complaint and attacks the subject matter jurisdiction of the court and the sufficiency of the causes of action stated in the complaint. It also alleges as a defense that the Secretary of Health, Education and Welfare has not found that the New York statute is in conflict with any Federal law or regulation.

In response to a motion by the plaintiffs to convene a three-judge court and obtain a temporary restraining order, and a counter-motion by defendants to dismiss the complaint for lack of subject matter jurisdiction, the district judge issued a memoradum and order which held that there was jurisdiction of the subject matter, and that the third cause

of action alleged a constitutional claim which was not wholly insubstantial, and directed the Clerk to notify the Chief Judge of the Circuit that a three-judge court ought to be convened pursuant to 28 U.S.C. § 2284. The motion for a temporary restraining order was denied and the motion for a preliminary injunction was referred to the three-judge court.

The case is before the three-judge court on three motions, plaintiffs' motion for a preliminary injunction, a second motion by plaintiffs for summary judgment, and a motion by defendants to dismiss for failure to state a cause of action. Voluminous affidavits and pretrial depositions are before the court. The parties have stipulated that these may be given the same effect as oral testimony.

### Class Action

During the oral argument, the court ordered that the case could be maintained as a class action under Rule 23 (b) (2) of the Federal Rules of Civil Procedure as one where the defendants have acted "on grounds generally applicable to the class," so that injunctive relief or declaratory relief should appropriately apply to the class as a whole. Since the parties and their counsel purportedly speak for the Hospital Association of New York State, Inc., and substantially all the hospitals in New York State are members of that association and familiar with the institution of the present action, it was determined that adequate notice to members of the class existed. It is therefore unnecessary to decide whether there is any constitutional requirement for notice to class members in situations where F.R.Civ.P. 23 (c) (2) does not presently require it. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); Note, Constitutional and Statutory Requirements of Notice under Rule 23(c) (2), 10 Boston Coll. Ind. and Comm.L.Rev. 571 (1969).

### Jurisdiction

The matter in controversy clearly exceeds the sum of $10,000. Therefore, jurisdiction exists under Section 1331(a) of the Judicial Code, relating to controversies arising under the constitution or laws of the United States. In this respect the case differs from Rosado v. Wyman, 414 F.2d 170 (2d Cir. July 16, 1969), where the Court of Appeals found that no individual plaintiff had as much as $10,000 at stake.

Most prior cases brought by welfare beneficiaries have relied on 42 U.S.C. § 1983 and 28 U.S.C. § 1343 for jurisdiction. Having more than $10,000 at stake, the plaintiffs in this case do not need to invoke Sections 1983 or 1343. Therefore, it is not necessary to deal with the problem cited in the footnote in King v. Smith, 392 U.S. 309, 312 n. 3, 88 S.Ct. 2128, 2130–2131, 20 L.Ed.2d 1118 (1968), concerning jurisdiction of suits challenging state AFDC provisions only on the ground that they are inconsistent with the Federal statute. See also McCall v. Shapiro, 292 F.Supp. 268, 275 n. 6 (D.Conn.1968), aff'd, 416 F.2d 246 (2d Cir., August 11, 1969).

The constitutional provisions invoked by the plaintiffs in this case are the supremacy clause in Article VI concerning the first cause of action, and the due process clause of the Fourteenth Amendment concerning the second and third causes of action.

■ This court agrees with the statement in the memorandum of the single judge that the claim of deprivation of property without due process of law in the third cause of action is not wholly insubstantial. Therefore, the renewed motion of the defendants to dismiss the amended complaint for lack of subject matter jurisdiction must be denied.

■ Having been properly convened, the three-judge court may deal with the issues arising under the Supremacy Clause, Florida Lime & Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 80 S.

Ct. 568, 4 L.Ed.2d 568 (1960), although this alone would not have sufficed for convening it. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965).

### Pertinent Facts

The basic facts affecting plaintiff hospitals are not disputed.

The material submitted to the court clearly shows that Catholic Medical Center in its operation of St. Mary's Hospital, will suffer substantial losses from the freeze, in respect of services rendered to Medicaid patients during the second half of 1969. There is a substantial risk that St. Mary's Hospital, which is located in the Bedford-Stuyvesant area of Brooklyn and which furnishes a substantial part of the medical and hospital service in a section where such services are in short supply, may be forced to close before the expiration of the freeze, if financial relief is not available.

The rate in effect for St. Mary's Hospital at March 31, 1969, was the rate which had been certified early in 1968 for the fiscal year, July 1, 1968 to June 30, 1969. This rate was fixed on the basis of the hospital's operations for the calendar year 1967, adjusted pursuant to the first alternative in Section 770.1(b)(6) of the State Hospital Code, by adding one and one-half times the average rate of cost increase over the preceding three years. The addition of one and one-half times the average annual rate of increase, in applying 1967 figures to a fiscal year which begins eighteen months later, merely brings the 1967 costs up to a reasonably anticipated 1968-69 level.

The actual daily cost for patients at St. Mary's Hospital at 1968 was more than the certified rate. The cost for the first five months of 1969 was still higher. Plaintiffs allege that the rate which would have been fixed for the fiscal year beginning July 1, 1969, on the basis of the State Hospital Code was even higher, as shown by the following table:

| | |
|---|---|
| Certified rate for semi-private rooms for fiscal year, July 1, 1968 to June 30, 1969 | $ 69.55 |
| Daily cost for calendar year, 1968 | 75.51 |
| Actual cost for 5 months, January 1 to May 31, 1969 | 88.43 |
| Rate which should have been fixed for fiscal year beginning July 1, 1969, by adjusting actual 1968 costs pursuant to the State Hospital Code | 107.27 |

While there was no evidence of the actual costs for the fiscal year beginning July 1, 1969, it is clear that they would not be less than the actual costs for the first five months of 1969, and therefore that the state's payments for patient care at St. Mary's Hospital were at least $18.88 below its actual costs per patient day, and that the differential was probably greater.

No facts were submitted by the state to show that the costs at St. Mary's or any other particular hospital, were excessive or unreasonable or reflected any inefficiency in operation.

St. Mary's Hospital lost $347,000 on Medicaid patients during the first five months of 1969, representing the difference between its actual cost and the rate of reimbursement fixed for the year, 1968-69. Contributions from the public, investment income, and other non-operating income may have offset its loss to some extent, but the hospital showed an over-all loss of $997,000 for 1968 after including all non-operating income.

There is no reasonable possibility of making up the loss on Medicaid patients by increased charges to those who are able to pay. Even a charge of $800.00 per day to rich patients would not bring the operations into balance.

Niagara Falls Hospital, the other named plaintiff, has not shown similar harm. It anticipates a loss of $35,378 before non-operating income for the fiscal year ending September 30, 1969. Non-operating income will result in a net gain of $64,622 for the year.

Most hospitals in the class represented in the suit are severely hurt by the freeze. The aggregate estimated differential between the rates fixed by the freeze and the rates to which the hospitals would be entitled under the State Hospital Code is over $23,000,000 for 219 of 311 member hospitals in the Hospital Association of New York State, Inc., for the period, July 1, 1969 through December 31, 1969. These figures, which are based on replies to a questionnaire sent by the Association, are not sufficiently accurate to form the basis of a dollar finding by the court, but they make it clear that the effect of the statutory freeze on hospitals serving Medicaid patients is very substantial.

The legislative finding on which the freeze was based cited rising hospital costs, disparities in costs, and the need for eliminating inefficient management as making it essential to establish an effective cost control program for hospitals (L.1969, Ch. 957, § 2). The increase in costs reflects to some extent the general results of inflation and to some extent the increased payroll costs which have been imposed on hospitals by the recent requirements of collective bargaining, liability for unemployment insurance contributions, and other governmental regulations.

Apart from general assertions that hospitals could operate more efficiently, there was no evidence submitted to the court that any hospital costs were "in excess of reasonable charges consistent with efficiency, economy, and quality of care" as provided in 42 U.S.C. § 1396a (a) (30). The state in its investigation of individual hospitals seems to have limited itself to desk audits, which constitute merely study of figures submitted by the hospitals on uniform state report forms. No field audit has been held of any hospital.

The Department of Hospitals has held a number of hearings in different parts of the state, and the Hospital Planning and Review Council has drafted a proposed set of "General Reporting Principles" and "General Reimbursement Principles" to govern facilities which provide services under Medicare and Medicaid. These documents provide a new and different basis for computing hospital costs after January 1, 1970.

### Letter from Department of Health, Education and Welfare

Copies of the New York 1969 legislation were made available to the United States Department of Health, Education and Welfare. It has not made any formal determination as to whether the statute under attack conforms with the Federal requirements. The latest communication on the subject is a letter from the Regional Commissioner of Health, Education and Welfare, dated September 23, 1969, which indicates serious doubts concerning the conformity of the freeze to Federal requirements. The pertinent portion of the letter, forwarded two days before the oral argument of the pending motions, stated:

"*Rates of Payment for Hospital and Health Related Services*

"The amendment of the freeze on rates of payments for hospital and health related services for the period from July 1, 1969 to December 31, 1969 still raises the question as to compliance with the Federal requirement that the State agency pay current reasonable costs of inpatient hospital services, using interim payments and annual retroactive adjustments or else making current payments designed to meet in

full the anticipated current reasonable costs. Clarification is needed as to whether the rate which will be established for use after December 31, 1969 will conform with the Handbook of Public Assistance Administration Supplement D–5364.3 to include a retroactive adjustment or an allowance in lieu of retroactive payments to settle for any amounts due for the period July 1, 1968–June 30, 1969 as well as the freeze period July 1, 1969–December 31, 1969. If it does not do so, it will raise question regarding conformity to the Federal requirements."

With respect to H.E.W.'s question whether there will be a retroactive adjustment or an allowance in lieu of retroactive payments to adjust for any amounts lost by the hospitals during the freeze, the Assistant Attorney General stated during the oral argument that

"It will not be retroactively. It will be prospectively only."

This statement was apparently based on a provision of the proposed "General Reimbursement Principles." Since that document had not been approved at the time of the oral argument, and may be amended by the Commissioner of Health under Section 770.1(g) of the State Hospital Code to bring it into conformity with H.E.W.'s requirements, we regard H.E.W.'s question as still unanswered.

### Constitutional Questions

Plaintiffs' void-for-vagueness argument is based largely on cases involving criminal statutes. See, e. g., Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966). An attack on a welfare statute as void-for-vagueness has been rejected. Snell v. Wyman, 281 F. Supp. 853 (S.D.N.Y.1968), aff'd, 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969).

Plaintiffs' attack on the statutes mandating admission of emergency cases was not supported by proof that they in fact imposed any substantial burden.

We pass these questions for the present. Cf. King v. Smith, 392 U.S. at 313, 88 S.Ct. 2128, *supra*.

### Conflict with Federal Standards

The state argues that this court should not determine the conflict between its 1969 statute and Federal law until the Secretary of Health, Education and Welfare has conducted a hearing on the question of such violation. It also argues that the issuance of an injunction would precipitate expenditures not contemplated in the state budget.

In order to deal with those arguments we must consider the nature of review that H.E.W. has available, the treatment of the budgetary problem in other cases, the doctrine of primary jurisdiction as applied in welfare cases and in its general development, and the extent to which special H.E.W. expertise is involved in this situation.

For present purposes we shall assume, without necessarily deciding, that the providers of medical service as well as its recipients have standing to complain of a state's violation of Federal law.

### The Nature of H.E.W. Review of State Health Plans

As will be seen, the application of the doctrine of primary jurisdiction depends on the circumstances of the particular litigation. A significant feature of the present case is the drastic consequences of an H.E.W. finding of departure from Federal standards. The result may be the forfeiture of many millions of dollars in Federal aid to New York State.

The Secretary of Health, Education and Welfare is empowered to determine, after a hearing, that a state plan has been so changed that it no longer complies with the provisions of 42 U.S.C. § 1396a. The only sanction given by the Social Security Act is that, until the Secretary is satisfied that there will no longer be a failure to comply with the Act,

"he shall make no further payments to such State (or shall limit payments to

categories under or parts of the State plan not affected by such failure)." 42 U.S.C. § 1396c.

■ The hospitals would not be necessary parties to a proceeding leading to termination of payments to the state. As providers of services, they might be able to apply for intervention in a violation proceeding or to obtain court review of a determination as persons "aggrieved" thereby.

Since such a proceeding would risk the loss of vast Federal funds by the state, and the hospitals themselves might suffer a loss of payments during the period of judicial review, their Federal administrative remedy is a precarious one.

In practice, however, there may be H.E.W. administrative procedures for dealing with such conflicts that are not set forth in statute or regulation, and are not known to the parties or to the court. The correspondence which has taken place between H.E.W. and state agencies in this case and in other cases (King v. Smith, *supra*, 88 S.Ct. at 2138, n. 23; Smith v. King, 277 F.Supp. 31, 36, 38 [M.D.Ala.1967]) suggests that this may be true, at least where the state violation is not the result of a state statute.

An invitation for informal review by H.E.W. is found in the New York Hospital Code, which provides that the methods of determining rates for care in hospitals shall be "subject to such adjustments * * * as may be required by the Federal Secretary of Health, Education and Welfare." Presumably, if H.E.W. requested that the provisions of the 1969 freeze be altered, the Commissioner of Health might recommend that the New York law be repealed or modified during the next session of the Legislature.

### Relevance of the State's Budgetary Problems

The State points to the extreme burdens beyond original expectations, which the Medicaid program has placed on the state budget. Lack of funds has not been recognized in earlier cases as a ground for disregarding Social Security Act standards. A three-judge court in Williams v. Dandridge, 297 F.Supp. 450, 459 (D.Md.1968), cert. granted October 13, 1969, stated:

"We do not hold that Maryland must appropriate additional funds to support its participation in the program of AFDC; we reiterate our previous holding that the Eleventh Amendment deprives courts of the United States from jurisdiction to grant such relief.

"We hold only that if Maryland has appropriated insufficient funds to meet the total need under AFDC, as measured by the standards for determining need that Maryland has prescribed, Maryland may not, consistent with the Social Security Act or the equal protection clause, correct the imbalance by application of the maximum grant regulation."

A similar statement was made by a three-judge court dealing with Arizona maximum grant statutes in Dews v. Henry, 297 F.Supp. 587, 592 (D.Ariz.1969).

Nationwide financial burdens resulting from Medicaid expenditures led Congress to provide a measure of relief in a late 1969 amendment to the Social Security Act (Pub.L.91–56, adding subsection (d) to 42 U.S.C. § 1396a). The method chosen by Congress was to permit states to eliminate services from their plans, but not to reduce payments to the providers of services. Under the 1969 amendment, a state may modify its plan "so as to reduce the scope or extent of the care and services provided as medical assistance under such plan or to terminate any of such care and services," provided the governor certifies that the average quarterly amount of non-federal funds expended for medical assistance under the plan after the modification takes effect will not be less than the av-

erage quarterly amount previously expended.*

Certain hospital services are protected from reduction under this section, since a specific exclusion from the state power to modify is that "nothing in this subsection shall be construed to authorize any modification in the State plan of any State which would terminate the care or services required to be included pursuant to subsection (a) (13)." This proviso would permit elimination of all hospital services to persons who are not aged, blind, permanently and totally disabled, or families with dependent children; but it does not appear to permit paying less than the reasonable cost for hospital services which are provided under the state plan. Of course, when New York's freeze legislation was approved on May 26, 1969, the state officials could not know the terms of Public Law 91–56, which was approved on August 8, 1969.

The state asserts that the freeze in hospital rates is necessary in order to eliminate inefficient practices and initiate a program of cost control in the hospitals. Attention to efficiency and cost control is nothing new. The Social Security Act requires that the state plan provide procedures "to assure that payments * * * are not in excess of reasonable charges consistent with efficiency, economy, and quality of care." 1396a(a) (30).

The State of New York in 1965 in its declaration of policy expressed concern with efficiency. Public Health Law § 2800. In fixing rates, the Commissioner was required from the outset to fix rates "reasonably related to the costs of efficient production of such service," taking into consideration "the need for incentives to improve service and institute economies, and excluding costs for research and any items not specifically identified." Public Health Law § 2807, (2), (3). See also State Hospital Code § 770.1(d).

The Commissioner of Health's determination of hospital reimbursement rates in 1968 therefore must have involved a finding that the rates were reasonable and were not inflated by inefficient operations or improper costs. Even if a flat freeze of all hospital rates is appropriate as an economy measure or as a prod to eliminate inefficiencies, the Legislature's choice of options in dealing with Medicaid is limited by the provisions in the H.E.W. Handbook of Public Assistance Administration that allowable costs for inpatient hospital services means "all necessary and proper expenses of an institution in the production of patient services." (D–5364.1, subd. d).

*The Doctrine of Primary Jurisdiction*

In conflicts between state welfare statutes or regulations and Federal law, the courts have more frequently than not proceeded to resolve the conflict without awaiting administrative proceedings by H.E.W. Cases of this sort are:

Solman v. Shapiro, 300 F.Supp. 409 (D.Conn.1969), aff'd, 396 U.S. 5, 90 S.Ct. 25, 24 L.Ed.2d 5 (October 13, 1969), finding that a Connecticut statute which deemed the income of a stepparent available for the support of a child was inconsistent with Federal regulations under AFDC;

Dews v. Henry, 297 F.Supp. 587, supra, invalidating Arizona maximum grant statutes;

Doe v. Shapiro, 302 F.Supp. 761 (D. Conn.1969), invalidating a Connecticut regulation which required the mother of an illegitimate child applying for AFDC benefits to identify the child's father;

Jefferson v. Hackney, 304 F.Supp. 1332 (N.D.Texas 1969), invalidating a percentage reduction in AFDC benefits;

Westberry v. Fisher, 297 F.Supp. 1109 (D.Me. 1969), sustaining attack on a state maximum grant regulation affecting AFDC beneficiaries; and

---

* The defendants' supplemental memorandum of law states facts which may raise questions under this clause, since the state and local share of Medicaid will be reduced from $614,200,000 in 1968–69 to $547,200,000 in 1969–70.

Williams v. Dandridge, 297 F.Supp. 450, *supra*, holding that the Maryland maximum grant regulation was invalid as inconsistent with the Social Security Act (42 U.S.C. § 602).

See also Note, Judicial Review of State Welfare Practices, 67 Col.L.Rev. 84 (1967), cited in several of the foregoing cases.

Other decisions, primarily in this Circuit, give greater consideration to the necessity for H.E.W. action, under the facts of the particular case. In Rosado v. Wyman, 414 F.2d 170 (2d Cir. July 16, 1969), the attack was on Section 131–a of the New York Social Services Law as amended in 1969, on the ground that it violated both the Social Security Act and the equal protection clause of the Fourteenth Amendment by permitting the state Commissioner of Social Services to fix lower levels of AFDC payments in Nassau County than in New York City. A majority of the court held that the District Court should have declined to exercise pendent jurisdiction until H.E.W. had completed its consideration of the matter, because the expertise of H.E.W. would be helpful in reviewing the alleged inconsistency between a complex state statutory scheme and an ambiguous Social Security Act amendment. Judge Feinberg dissented on the ground that irreparable injury might ensue during the indeterminate length of time which would be required for H.E.W. to study the problem and negotiate with the state.

In Lampton v. Bonin, 299 F.Supp. 336 (D.La.1969), the court refused to review the validity of an H.E.W. regulation concerning the duty of states to increase payments to recipients of AFDC benefits, but only on the ground that the deadline for compliance with Section 402(a) (23) of the Social Security Act had not yet arrived. The court retained jurisdiction in order to pass on the point, if necessary, after Louisiana enacted its new appropriations law for the fiscal year commencing July 1, 1969. Judge Cassibry in a dissenting opinion stated that the court should have proceeded at once to find the H.E.W. regulation invalid (299 F. Supp. at 355).

In O'Reilly v. Wyman, 305 F.Supp. 228 (S.D.N.Y. September 22, 1969), a three-judge court refused to deal with complex questions concerning the determination of "available income" under the co-insurance provisions of the Social Security Act (42 U.S.C. § 1396a(a) (14) (Supp. 1969), Pub.L. 9156) and the New York Social Services Law (Section 367-a (4)'), because H.E.W. itself was considering New York's legislation, and the state administrative officials "have not as yet had an opportunity to act under the amendment or to react to specific cases." The majority of the court stated that "Individual borderline situations * * * do[es] not create constitutional infirmity." There was no evidence of irreparable injury. Although a preliminary injunction was denied, the court retained jurisdiction so that the facts might be developed upon a trial.

In Rothstein v. Wyman, 303 F.Supp. 339 (S.D.N.Y. August 4, 1969), a preliminary injunction was granted on the ground that the fixing of one level of benefits for New York City and a lower level for Westchester County violated normal standards of equal protection, but a majority of the court deferred consideration of the further question whether Section 131–a of the New York Social Services Law violated the Social Security Act, because H.E.W. was reviewing the justification for the differential.

The importance of the facts of the particular case in determining the incidence of the doctrine of primary jurisdiction is illustrated in the *Rothstein* case where Judge Hays concurred in the granting of a preliminary injunction, even though he had written the opinion in *Rosado* reversing a preliminary injunction.

### General Principles

■ The doctrine of primary jurisdiction is basically concerned with "promoting proper relationships between the courts and administrative agencies charged with particular regulatory du-

ties." United States v. Western Pacific R. Co., 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). Mr. Justice Harlan stated in that case (352 U.S. at 64, 77 S.Ct. at 165):

> "No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation."

See also 3 Davis, Administrative Law, § 19–01 (1958); The Doctrine of Primary Jurisdiction: A Reexamination of Its Purpose and Practicality, 48 Geo.L.J. 563 (1960).

Federal Maritime Board v. Isbrandtsen Co., Inc., 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958), shows the limitations of the doctrine of primary jurisdiction. The Supreme Court there held that the agency was not free to approve or disapprove agreements where the meaning of the law was clear. It set aside an order of the Maritime Board as illegal.

### The Need for H.E.W. Expertise in Deciding this Case

■ The desirability of having the expertise of the administrative agency is an important factor in determining whether a court should defer to the primary jurisdiction of the agency. Jaffe, Judicial Control of Administrative Acttion, 123–25 (1965); Rosado v. Wyman, supra; Far East Conference v. United States, 342 U.S. 570, 574–575, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1953). If the question here were the conformity of New York's proposed "General Reimbursement Principles" with Federal law, there would be a substantial need for H.E.W.'s expertise. An across-the-board freeze of the prior year's rates, for all hospitals, does not involve as complex an issue in comparing the New York statute with the Social Security Act.

■■ Where a case involves only a matter of law, a court may proceed without preliminary resort to the administrative agency. Great Northern Ry. v. Merchants Elevator Co., 259 U.S. 285, 294, 42 S.Ct. 477, 66 L.Ed. 943 (1922). The time necessary to obtain an administrative ruling is also a factor. Smith v. Illinois Bell Telephone Co., 270 U.S. 587, 591, 46 S.Ct. 408, 409, 70 L.Ed. 747 (1926). The absence of an available procedure for obtaining an administrative determination is also a factor working against the doctrine of primary jurisdiction. Local Union No. 189, Amalgamated Meat Cutters etc. v. Jewel Tea Co., 381 U.S. 676, 687, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). We have already seen that the hospitals have no direct remedy in H.E.W.

There is precedent for holding a case until an administrative determination can be made. Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 619, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944).

■ Since H.E.W. is not a party to this litigation, it seems proper to defer decision of the motions for a short period in order to hear from the Department. It may be that H.E.W. has dealt with similar problems in some other state, that it has relevant negotiations underway, or that it will point to some part of the statutory scheme for its participation that we have overlooked.

It appears that H.E.W. intervened effectively during New York's regular 1969 legislative session, by raising a question about the validity of a two-year freeze that was originally enacted. (L. 1969, c. 184). A letter from the New York Regional Commissioner to Commissioner Wyman, dated April 16, 1969, which was not available to the Attorney General or the court until after the hearing, said that the two-year freeze would raise "a serious question as to the conformity of your Title XIX plan with Federal requirements * * *." The same letter stated that:

> "There must be payment of current reasonable costs, using interim payments and annual retroactive adjustments, or else making current payments designed to meet in full the anticipated current reasonable costs."

Now that the Legislature is not in session to make a further change in the freeze statute which an H.E.W. official says may "still" violate the Federal requirements, H.E.W. may speak in favor of immediate action by the court.

The imminent disaster which threatens many hospitals dictates that the delay in deciding the case before this court should not be long.

The court will therefore defer determination of the motions, to afford the Department of Health, Education and Welfare an opportunity to express its views, on or before November 20, 1969, either by submitting a brief as *amicus curiae,* or by application to intervene or in such other manner as it deems appropriate.

The Clerk is directed to forward a certified copy of this memorandum to Hon. Robert H. Finch, Secretary of Health, Education and Welfare, 330 Independence Avenue, S.W., Washington, D. C. 20201.