[No. 4832-9-II.   Division Two.   March 10, 1983.]

WASHINGTON ASSOCIATION OF CHILD CARE AGENCIES,
ET AL, *Appellants*, v. GERALD THOMPSON,
*as Secretary of the Department of
Social and Health Services,*
ET AL, *Respondents.*

*H. Scott Holte,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *David R. Minikel, Assistant,* for respondents.

PETRIE, J.—Plaintiff Washington Association of Child Care Agencies (WACCA), on behalf of the class of private agencies who are licensed by the State of Washington to provide care for and supervision of abused, dependent, neglected and/or disturbed children, appeals a judgment dismissing the agencies' action for damages which they filed on November 22, 1978, against the Secretary of the Department of Social and Health Services (DSHS) and the State of Washington. Plaintiff agencies contend they have been grossly underpaid for the services they rendered for 6 years preceding the filing of their complaint. We affirm.

Plaintiff agencies provide group foster care for children whom they voluntarily accept upon referral by DSHS after DSHS has found those children eligible for care. DSHS is authorized to "purchase care" for those children by "using properly approved private agency services for the actual care and supervision of such children" insofar as those agency services are available. RCW 74.13.031(8).[1]

---

[1] Insofar as applicable to the case at bench, the Department's duty and authority stem from Laws of 1937, ch. 114, particularly as amended by Laws of 1947, ch. 260. Presently codified as RCW 74.13.031, the statute has been amended on several occasions with no substantial change, however, in presently numbered

The parties appear to disagree substantially on how the issues on appeal should be framed. Accordingly, at the outset we are forced to examine somewhat critically the nature of plaintiff agencies' theories of recovery as set forth in their pleadings and in the trial record as a whole.

In its first cause of action (applicable to this appeal), WACCA alleged that each plaintiff agency "has in the past and continues to furnish care for and supervision of children at the requests of Defendants and pursuant to RCW 74.13.031" and that defendants have not paid reasonable rates for such services. Plaintiff agencies allege defendants' actions (1) violate the laws of the State of Washington, including but not limited to RCW 74.13.031; (2) violate plaintiffs' rights to due process of law guaranteed by the state and federal constitutions; and (3) "have taken the private property of the individual Plaintiffs and the members of the Plaintiff Class without just compensation," in violation of plaintiffs' rights constitutionally guaranteed under article 1, section 16 of the state constitution. Nevertheless, plaintiffs and defendants have stipulated that all agencies were required to and did execute written contracts annually with DSHS for the time period through June 30, 1978. Representative sample copies of those contracts illustrate that, for a specified monthly dollar amount for each child accepted, each plaintiff agency agreed to furnish the program of services as contemplated by RCW 74.13 and as compiled in DSHS's "Directory of Voluntary Child–Caring Institutions, Agencies and Public Children's Institutions".

---

subsection 8. When this complaint was filed subsection 8 was designated subsection 7. It provided:

The department shall have the duty to provide child welfare services as defined in RCW 74.13.020, and shall:

. . .

(7) Have authority to purchase care for children and shall follow in general the policy of using properly approved private agency services for the actual care and supervision of such children insofar as they are available, paying for care of such children as are accepted by the department as eligible for support at reasonable rates established by the department.

Laws of 1977, 1st Ex. Sess., ch. 291, § 22.

Furthermore, the record also establishes that for the period commencing July 1, 1978, plaintiff agencies refused to sign the written contracts (again specifying a monthly rate of payment for each agency). Though some agencies continued to refuse signing these contracts, others did sign them after this action was certified as a class action, and all agencies which did accept children referred to them by DSHS (with or without a signed contract) were paid, for the months in which the service was rendered, in accordance with the rates newly promulgated by DSHS.

■■ As to those agencies which executed written contracts, the rule of law generally applicable is that in the absence of a breach of that contract (which is not alleged here), each party is bound by the terms of that contract and may not bring an action relating to the same matter on a theory of "contract" implied by law, in contravention of the express contract. *Chandler v. Washington Toll Bridge Auth.,* 17 Wn.2d 591, 137 P.2d 97 (1943). Furthermore, those agencies which refused to execute written contracts but nevertheless accepted children for care following DSHS's referral knew at the time a child was accepted the amount of DSHS's offer of payment. No such agency was bound to accept any child referred to it. Accordingly, acceptance of a child for care constituted a contract implied in fact, which in turn was an express contract. *Johnson v. Whitman,* 1 Wn. App. 540, 463 P.2d 207 (1969).

In their trial brief plaintiff agencies seek to avoid application of this generally applicable rule of law because (1) when "the amount of compensation to be paid is reserved for determination by one party to a contract, and the intent is that the amount shall be reasonable, and the contracts have been performed, the court shall fix the reasonable monetary amount" and (2) in any event, the contracts "insofar as they fix the amount of compensation to be paid by DSHS," are void against public policy because those amounts are not reasonable as mandated by RCW 74.13-.031(8).

At trial plaintiff agencies repeatedly asserted that any

contracts they entered into were executed on their part as a result of mutual mistake, misrepresentation or fraud, or duress as defined by common law or business compulsion. After the conclusion of the trial, counsel for WACCA sent an explanatory letter to the trial court expressing the view that for the post–1978 period as distinct from the pre–1978 period, plaintiffs "flatly rejected" the rate established by the department; and accordingly, their "cause of action for the post–1978 period is based solely upon an implied or quasi contract to recover the reasonable value of services rendered to and received by" DSHS. In other words, they asserted, "[t]here was no meeting of the minds, whatever, as to 'rate'." On appeal they assert recovery should be allowed for both time periods on the basis of quantum meruit because no rates established by DSHS at any time were "reasonable." Indeed, plaintiffs assert that all these "rates" violated both state and federal law (1) by failing to reimburse plaintiffs for the total reasonable costs incurred by plaintiffs in rendering the services provided, and (2) by taking into consideration the fact that most of plaintiff agencies received financial support from various private sources. Indeed, if we understand plaintiffs' position correctly, they appear essentially to be challenging the basis upon which the department prepares and presents its biennial budgetary requests to the Legislature.

Cutting a swath through all of plaintiffs' assertions, we hold simply (1) the department at all times paid the rate contractually agreed upon by each individual agency and DSHS; (2) the department's statutory "duty" at all times was to enter the marketplace and purchase these services at rates reasonably available for the variable types of services needed and to request funds from the Legislature based upon that availability; (3) the Legislature at all times knew plaintiff agencies were not being reimbursed by the State for the total reasonable cost of those services; (4) the Legislature never intended the rate setting mechanism to be a "reasonable cost reimbursement system"; (5) no federal law or regulation prohibited DSHS from doing precisely what it

did; and (6) had DSHS paid rates contrary to those provided by express contract or in excess of appropriations made by the Legislature, it would have acted not only unreasonably but also unlawfully.

Because the trial court so eloquently expressed these same views in its memorandum opinion, we quote extensively from it—

> The statute in question is rather indefinite and no definition of the term "reasonable" is contained therein nor are standards set forth which assist the court in determining the legislature's intention. Several things are clear, however, from a plain reading of RCW 78.13.031(7) [now 74.13.031(8)]. First, it is obvious that the rates are to be established by the Department and not by the agencies providing the child care. Secondly, it is clear that the statute with which we are here dealing does not establish a cost reimbursement system such as is currently extant in the case of nursing home providers. It should be noted, at this point, that there is a substantial difference, in this court's judgment, between a payment system which reimburses for costs and one that provides only that the purchaser pay a reasonable rate. The principal distinction is that in a cost reimbursement system the vendor basically establishes the rates whereas in a system such as we have in the present case the rate is established by the purchaser. This can be a significant difference since what is viewed as a nonreimbursable cost for program enhancement today becomes a part of the total cost of care and supervision in tomorrow's budget. In short, in a cost reimbursement system the costs can conceivably escalate at a rate much greater than that caused by inflation with the purchaser seemingly powerless to control the increase.
>
> It is not for this court to speculate as to why the legislature provided for a system that requires only the payment of reasonable rates rather than a cost reimbursement system. Perhaps, the legislators anticipated that the non–profit child care agencies, with their long history of eleemosynary activities, would be willing and able to provide these services for less than cost. If that was the case perhaps that assumption is no longer correct. However, viewing the case not as a legislator but as a court it is the court's conclusion that the rates the

agencies are to be paid, as they have been established by the Department pursuant to RCW 74.13.031, are reasonable rates to pay when one views them in light of practical and economic realities facing the Department at the time of rate setting. Principally, the rate setting reflects the fact that the Department felt obliged to set rates which recognized a restraint on their expenditures imposed by the amount of the appropriation by the Washington State Legislature for the purchase of these kinds of services. It can hardly be suggested that it is unreasonable for the Department to feel limited by the amount of the appropriation nor can it be argued successfully that rate setting, inhibited by such budgetary considerations, is arbitrary or capricious. In this court's judgment it would have been unreasonable and indeed unlawful for the Department to ignore the legislative appropriation and to establish rates which, when applied to the projected case load, would cause expenditures which would exceed the amount appropriated by the Legislature.

The court concludes, therefore, that the rates set were reasonable and are not in violation of RCW 47.13.031 [*sic*] [74.13.031]. That, I recognize, is merely a conclusion of law and does not mean that the rate seems reasonable to the purveyors of these services who are, of course, the plaintiffs in this lawsuit. Whether they see it as reasonable is something they must decide for themselves and is more an economic question than a legal question. Whether it is reasonable for them to accept rates from the state which do not compensate them for their total costs and which, thus, result in the agency having to rely on outside funding is one that the agencies will have to determine for themselves without judicial interference. One would suspect that if the rate is unreasonable, as has been argued, that eventually these agencies will refuse to provide the services which the state desires. Furthermore, some agencies will, perhaps, choose to not even provide these kinds of services any longer feeling, as several witnesses expressed, that it is not fair for the State to expect the charitable organizations to underwrite many of the expenses of providing child care and supervision for children under the custody of the State of Washington. Faced with such a situation the executive and legislative branches of government will have to

decide if the rates they have set are truly reasonable from an economic standpoint and whether or not they should be adjusted upward. Those adjustments, if they indeed come about, should be dictated by economic and political considerations and should not be the result of judicial fiat. Indeed, if the State of Washington should find, at some future time, that at these rates there are not sufficient purveyors of these kinds of services for children, it should not be necessary for this court to tell the legislative and executive branches of government that the rates are unreasonable.

Ordinarily we would terminate this opinion at this point and affirm the judgment based simply on the reasoning set forth in the trial court's memorandum. Because of the nature of several arguments presented on appeal, however, we are constrained to prolong this opinion, perhaps unduly. Furthermore, the parties are entitled to some additional explanation of this court's reasoning.

The fundamental question on appeal, obviously, is whether DSHS, during the 6 years in question, has been "paying for care of such children . . . at reasonable rates established by the department." RCW 74.13.031(8). The department's studies demonstrate that it has been paying approximately only 50 percent of these plaintiff agencies' total costs of supplying these services. DSHS asserts that until July 1, 1978, it paid each agency in the class precisely the rate per child which that agency agreed to under the terms of a written contract with the department for each fiscal year in which the agency accepted children. Those rates were last fundamentally established for each agency in 1973 and adjusted annually until June 30, 1978, by a percentage increase commensurate with the overall increase in the legislative appropriations. In addition, the department asserts that because of the increasing caseload of eligible children above the department's estimated projections which had been utilized as a basis for the department's biennial budget request, DSHS had usually paid the agencies more than the Legislature had appropriated for group foster care.

One of WACCA's contentions on appeal is that DSHS's self–imposed constraint not to exceed the amount "appropriated" by the Legislature led the department to conclude erroneously that a "reasonable rate" had to be based upon a system which starts with the premise that the program's total "appropriation" shall not be overspent. Indeed, WACCA insists that the public policy as expressed by the Legislature when defining the department's *duty* under RCW 74.13.031 is so strong that somehow DSHS should have found funds to reimburse plaintiff agencies for their reasonable costs incurred in providing services to the children accepted for care. That assertion raises several subissues, among which are the following:

1. Did DSHS properly allocate to the program the amount which the Legislature appropriated for the program?

2. Did DSHS have available to it other funds with which to pay for these services? Did DSHS have other avenues available to insure proper reimbursement to plaintiff agencies?

3. Does RCW 74.13.031(8) mandate DSHS to establish a reasonable cost reimbursement system to pay for these services?

4. Do federal statutes and regulations mandate a reasonable cost reimbursement system?

5. Notwithstanding a lack of funds to reimburse plaintiff agencies for their costs reasonably related to the services provided, is the State of Washington nevertheless obligated to pay the total reasonable costs of these services on a quantum meruit basis?

We consider these subissues seriatim.

The state budget act does not specify a line item appropriation for this particular program. Rather, in recent years at least, the Legislature has provided a line item appropriation to DSHS for Family and Children Services under the general category of Community Social Services Program. In 1975, for example, the Legislature appropriated the sum of $81,396,522 for fiscal years 1976 and 1977 for Family and

Children Services. Plaintiffs' exhibit 1, prepared by William Kramer, DSHS's Chief of the Office of Program Analysis Services, shows that the appropriation for Group Foster Care for FY 1976 was $5,737,476 and the actual expenditure experienced by DSHS in FY 1976 was $7,471,319.[2] The same exhibit shows that the department's projected caseload estimate was 1,323 children, whereas the actual experience for FY 1976 was 1,505.

Subsequent to July 1, 1978, plaintiff agencies refused to enter into written contracts with DSHS. After this action was certified as a class action, as previously noted, some of the agencies did execute a contract with DSHS. With or without a written contract, plaintiff agencies have accepted children eligible for state support. Agencies were then paid under a rate structure called a "fundable option" formula.[3]

We are satisfied from Mr. Kramer's explanation of how exhibit 1 was prepared that DSHS's allocation of funds to this program was appropriate. Although DSHS's allocation is not, strictly speaking, a specific legislative "appropriation", its determination rests on a reasonable basis which an administrative agency should make in allocating funds of subprograms. Indeed, it would be dangerously foolish for an administrative agency to ignore any guideline offered through the legislative process. We hold, therefore, that DSHS acted reasonably when determining its original fiscal year allocations of funds for this program.

WACCA points out properly, particularly for the bien-

---

[2] When asked to explain how exhibit 1 was developed, Mr. Kramer testified:

"As a general statement, speaking to more recent periods, there are working notes that are prepared usually by legislative staff, which indicate the specific decisions that are made by the legislature in developing the Appropriations Act, and they are usually done in the form of steps or incremental changes from the governor's budget request, and using those staff notes, we are able to develop a number that shows what was implicit in the total appropriation."

[3] By separate opinion filed this date, *Washington Ass'n of Child Care Agencies v. Thompson*, 34 Wn. App. 225, 660 P.2d 1124 (1983), we have held that the few disparate rate increases among several plaintiffs, created by adoption of the "fundable option" formula, did not violate equal protection rights of the several agencies who did not receive a 5.5 percent increase in FY 1979.

nium July 1, 1977, to June 30, 1979, that the Legislature specifically granted DSHS authority to transfer funds among its several programs up to $10 million in the aggregate, even without prior approval of the Office of Program Planning and Fiscal Management. Laws of 1977, 1st Ex. Sess., ch. 339, § 51(7). Furthermore, WACCA points out, DSHS could have sought utilization of some of the funds appropriated to the Governor's emergency fund. Obviously, however, interprogram transfer of funds or use of emergency funds requires that DSHS first be confronted with an emergency of substantial magnitude. From plaintiffs' standpoint undoubtedly such an "emergency" existed. From the department's standpoint, however, no emergency existed if private agencies continued voluntarily to accept and provide care for children individually referred by DSHS at rates per child promulgated by DSHS. Under the department's interpretation of its ratemaking duty under RCW 74.13.031, and in the absence of a showing that interprogram transfer of funds would not substantially impair management of the "deprived" program, we cannot fault DSHS for failing to utilize its transfer authority. Neither can we fault DSHS for failing to seek use of emergency funds allocable by the Governor.

This brings us to the meaning of the term "reasonable rates" in RCW 74.13.031(8). The trial court aptly noted the contrast between this statute's term "reasonable rates," left undefined since 1947, and the specific ratemaking function of DSHS for purchasing nursing home care. Laws of 1977, 1st Ex. Sess., ch. 260, formerly codified as RCW 74.09.550–.590, and subsequently repealed by Laws of 1980, ch. 177, § 90, provided a detailed "cost reimbursement" ratemaking system for purchase of nursing home care by DSHS. In particular, former RCW 74.09.590 provided in part that nursing homes shall be reimbursed "in full for actual allowable costs" pursuant to federal regulations and generally acceptable accounting principles. For years the Legislature knew that it was not reimbursing group foster care agencies in full for cost of services pro-

vided. Indeed, in 1973 and 1977, essentially through efforts of plaintiff agencies' legislative representatives, the Legislature granted additional so–called "inflationary" appropriations for the foster group care program without, however, directing DSHS specifically to reimburse plaintiff agencies "in full for actual allowable costs."

In 1977 the Legislature did appropriate $1,061,000 "for an increase in the vendor rate for private child caring agencies", with the proviso that such funds could not be expended until DSHS

> developed a revised system for private child caring agencies which include[s]:
>
> (a) The classification of children according to their needs;
>
> (b) The classification of facilities according to established program standards;
>
> (c) A reimbursement system which compensates facilities for services provided;
>
> (d) The development of program and fiscal operation standards; and
>
> (e) An audit capability to review the implementation of such program and fiscal operation standards.

Laws of 1977, 1st Ex. Sess., ch. 339, § 58(2).

When comparing this statutory directive with the specific directive for purchase of nursing home care, both adopted by the same Legislature, we find it difficult to hold that the Legislature intended, even in 1977, that DSHS should reimburse plaintiff agencies in full for their cost of providing services. Most certainly we cannot hold that the proviso in the appropriation act amended RCW 74.13.031(8). *State ex rel. Living Servs., Inc. v. Thompson*, 95 Wn.2d 753, 630 P.2d 925 (1981). Again, as noted by the trial court, "[i]t is not for this court to speculate as to why the legislature provided a system that requires only the payment of reasonable rates rather than a cost reimbursement system."

We turn then to WACCA's contention that federal statutes and regulations require DSHS to interpret "reasonable rates" as full reasonable cost reimbursement to the vendors of group foster care. WACCA asserts that Titles 4A, 4B and

20 of the Social Security Act of 1935, as amended, imposed upon states the obligation to fully reimburse plaintiff agencies for reasonable costs incurred in providing group foster care for eligible children. All three titles are federal reimbursement programs available to states under specifically approved state plans for certain defined services. Title 4A, 42 U.S.C. §§ 601–15, provides reimbursement under the category of Aid to Families with Dependent Children (AFDC). Title 4B, 42 U.S.C. §§ 620–28, provides reimbursement under the category of Child Welfare Services. Title 20, 42 U.S.C. § 1397, provides reimbursement under the category of social services, with funds therefor being first made available in October 1975.

The trial court specifically found that Title 4A funds were included in the rates paid to plaintiff agencies. The trial court also specifically rejected a proposed finding that Title 4B funds were included in the rates paid to plaintiff agencies. The trial court also entered additional findings as follows:

2. Federal funds commonly known as Title XX were and are used in part by the Department in the payment of salaries and benefits of Department employees, including field case–workers, other staff who supervised the placement of children with the Plaintiff agencies, and staff who supervised the licensing and auditing of the Plaintiff agencies; whereby the state participates in said programs.

3. Department employees, including field case–workers, are directly involved in the care and supervision of children placed with the Plaintiff agencies.

██ WACCA has not assigned error to any of these findings, and we accept them as verities. We find nothing in the federal regulations interpreting Title 4A which attempts to define the term "reasonable rates." Nor does WACCA appear seriously to so contend. Rather, WACCA directs us to part B of appendix F to 45 C.F.R. § 74 (1978), governing federal reimbursement grants under Titles 4B and 20. That regulation provides in part:

Factors to be considered in determining the allowability

of individual items of cost include (a) reasonableness, (b) allocability, (c) application of those generally accepted accounting principles and practices appropriate to the particular circumstances, . . .

Additionally, the same regulation provides in part:

A cost is reasonable if, in its nature or amount, it does not exceed that which would be incurred by an ordinarily prudent person in the conduct of competitive business.

Further, appendix F is made applicable

to cost–reimbursement type contracts performed under DHEW [now DHHS] grants and cost–reimbursement type subcontracts and shall be used as a guide in the pricing of fixed price contracts and subcontracts.

45 C.F.R. § 74, app. F, pt. A (1978).

In view of these federal regulations it appears that when either Title 4B or Title 20 reimbursable funds were available to states electing to apply for either of those grants, the types of cost reimbursement sought by plaintiff agencies would be allowable as cost items. DSHS points out, however, that Washington State's Comprehensive Annual Social Services Plans, all of which necessarily had been approved by the Secretary of the former Department of Health, Education and Welfare, did not include or contemplate use of Title 4B or Title 20 funds for payment to private agencies of their costs incurred while providing child welfare services. The record reflects quite clearly, however, that, at least with regard to Title 20 funds, the state plan *could have been modified* to reflect inclusion of plaintiff agencies' reasonable costs as reimbursable items.

We perceive WACCA's contention here to be that DSHS deprived plaintiff agencies of the opportunity to be reimbursed for their total reasonable cost of providing child care services by (1) ignoring the 1977 legislative mandate to develop a revised system for payment of child caring agency services which included as a factor, "a reimbursement system which compensates facilities for services provided"; (2) by failing to seek modification of Washington State's plan for Title 20 funds to include plaintiff agencies' cost allow-

able under appendix F; and (3) by failing to present to the State Legislature a budget seeking an appropriation which included items in the proposed modified state plan. The uncontested fact is that, in developing the "fundable option" system, DSHS did contemplate utilization of the funds regularly appropriated for this program plus the $1,061,000 specifically appropriated for the "increase in the vendor rate for child caring agencies" and, in addition, sought $3,500,000 in a supplemental budget request in 1978 for use in FY 1979. The Legislature in response saw fit to approve $2,100,000 of the $3,500,000 requested. Laws of 1979, ch. 15, § 8(6). The total of all those funds failed, in the department's estimates, to produce sufficient funds to reimburse plaintiff agencies for their total reasonable costs. We decline to speculate as to possible legislative reaction to a departmental budgetary request which might have included all that WACCA now contends DSHS should have done to support full implementation of a total, reasonable cost–reimbursement formula. We cannot and do not fault the department for its failure to do what WACCA now contends it should have done in 1978.

Before leaving this topic we distinguish the facts in the case at bench from the facts in the cases on which WACCA relies. *Catholic Med. Ctr. v. Rockefeller,* 305 F. Supp. 1256 & 1268 (E.D.N.Y. 1969), both *aff'd,* 430 F.2d 1297 (2d Cir. 1970).

In both *Rockefeller* cases, the State of New York attempted by statute to "freeze" rates of payment to hospitals pursuant to federal standards for the cost of care given to Medicaid patients under Title 19 of the Social Security Act. Federal funds used to reimburse the hospitals were jeopardized because the Secretary of HEW refused to approve the "freeze," contending that it was in conflict both with New York's obligation under the state's approved comprehensive plan and also HEW's standards for rates to be paid to hospitals. The court noted that that conflict violated the supremacy clause in article 6 of the United States Constitution. The court also noted that imposition of a

mandatory injunction directing a state officer to pay money that has not been appropriated would be an extreme exercise of federal judicial powers. The court did not issue the injunction, but refused to do so solely because New York assured the court it was prepared to take remedial action. Nevertheless, the court ordered New York to pay the rates contemplated by the comprehensive plan and only after approval of certification by HEW.

In the case at bench, however, no federal funds are being utilized in conflict with federal standards. The rates paid by DSHS are not inconsistent with Washington's comprehensive plan, and there is no contention by HEW that Washington is out of compliance. There is no violation of the supremacy clause. The *Rockefeller* cases are simply inapposite.

This brings us to consideration of WACCA's contention that, notwithstanding a lack of funds, DSHS should nevertheless have reimbursed plaintiff agencies on a quantum meruit basis. At this point we digress briefly to examine only partially how DSHS developed its "fundable option" formula. That matter is developed more extensively in a companion opinion filed this date, *Washington Ass'n of Child Care Agencies v. Thompson,* 34 Wn. App. 225, 660 P.2d 1124 (1983). For our purposes, however, we note only that Sherilynn Casey, the department's management analyst who helped develop the "fundable option" formula, testified that DSHS experimented with several fixed cost factors and extent of staff reimbursement and finalized on a figure of $211 per month per child serviced plus reimbursement for an agency's nonsupervisory staff "so that we would not over–expend" the program appropriation. DSHS acknowledges that the total of these two factors was considerably less than the agencies' average monthly costs. As previously noted, utilizing these limited reimbursement factors nevertheless resulted in the department's subsequent decision to request a $3,500,000 supplemental appropriation, of which the Legislature provided $2,100,000.

When WACCA members expressed disapproval of the

"fundable option" plan, DSHS revised the formula to provide a maximum and minimum rate for each level of care and increased some but not all agencies' rates up to a maximum of 5.5 percent over that provided for the preceding year.

Plaintiff agencies assert that these rates are so far below their actual reasonable costs that the State should be required to increase them substantially on the basis of quantum meruit. Quantum meruit is not a legal obligation. *Heaton v. Imus,* 93 Wn.2d 249, 608 P.2d 631 (1980). Rather, it is a remedy sometimes available in the absence of an express contract. We have already noted that, to the extent plaintiff agencies provided services pursuant to an express contract, quantum meruit is not available.

We consider now whether, to the extent these services were provided in the absence of an express contract, quantum meruit is available to plaintiff agencies. As indicated above, DSHS promulgated reasonable rates pursuant to its interpretation of RCW 74.13.031(8). We cannot hold, therefore, that, to the extent the State of Washington has been "enriched," if it has been enriched by reason of the fact that only 50 percent of plaintiffs' costs have been paid, that that "enrichment" is unjust. Most certainly we cannot hold, in view of an appropriation known by the Legislature to be inadequate to fully reimburse plaintiff agencies for their total reasonable costs, that DSHS should have overexpended its appropriation for this program or that it should have ceased certification of eligible children when private agencies continued to voluntarily accept those children.

Finally, we recognize that in this already unduly prolonged opinion we may not have responded fully to all of plaintiffs' assertions. Frankly, some of them are frivolous. Included among those totally meritless assertions is the contention that plaintiff agencies furnished services in excess of that provided in the pre–1978 contracts. The trial court found that they did not, and the record amply supports the trial court's finding. Equally meritless is plaintiffs'

252

contention that the pre–1978 contracts were ambiguous. The trial court determined they were not, and we do also.

Judgment affirmed.

PETRICH, C.J., and WORSWICK, J., concur.

Reconsideration denied April 8, 1983.

Review denied by Supreme Court June 3, 1983.