[No. 4606–7–II. Division Two. March 10, 1983.]

WASHINGTON ASSOCIATION OF CHILD CARE AGENCIES,
ET AL, *Respondents*, v. GERALD THOMPSON,
*as Secretary of the Department of
Social and Health Services*,
ET AL, *Appellants*.

*Kenneth O. Eikenberry, Attorney General,* and *David R. Minikel, Assistant,* for appellants.

*H. Scott Holte,* for respondents.

PETRICH, C.J.—The defendants, State of Washington and Gerald Thompson, former Secretary of the Department of Social and Health Services (DSHS), appeal from a summary judgment which requires DSHS to incorporate into its child care agency rates for fiscal 1979 a 5.5 percent increase over the previous years' rates of each agency as an inflationary increment authorized by the Legislature.

The issue presented is whether DSHS's child care agency rates for fiscal 1979, structured on standards of service which differed from those of prior years, violates the equal protection clause of the fourteenth amendment to the United States Constitution or the privileges and immunities clause of article 1, section 12 of the Washington State Constitution when a component of the 1979 rate is an allocation of funds designated for inflationary purposes which varies percentagewise from the prior rates of the respective agencies.

We conclude that the allocation of the appropriated funds by DSHS was not in violation of the constitutional provisions and reverse.

The plaintiffs, several child welfare agencies licensed by the State to provide care for and supervision of abused, neglected, and/or disturbed children, and their trade association, the Washington Association of Child Care Agencies, initiated a lawsuit on behalf of all the named plaintiff agencies and all other similarly situated child care agencies

against DSHS. They sought damages because rates paid by DSHS within the appropriate limitation of action period for services rendered on behalf of children placed by DSHS with the agencies (1) were less than reasonable as required by statute, and (2) amounted to a denial of due process and the taking of property without just compensation in violation of the federal and state constitutions. The lawsuit also sought affirmative relief to require the State and DSHS to pay the agencies certain sums allocated for child care services by the legislative appropriation for the 1977–79 biennium and to require the payment of inflationary increases in agency rates equally to all members of the plaintiffs' class, as required by the Constitutions of the United States and State of Washington.

This appeal concerns only the claim that inflationary increases for the fiscal year 1979 must be equally allocated among the agencies.[1]

During the period at issue, DSHS paid approximately 78 child care agencies for services to children placed by DSHS with the agencies. Prior to fiscal 1979, the agencies were paid on an individual basis according to expenditures within certain reimbursable cost "centers." The cost center factors included food, clothing, rent, repairs, utilities, maintenance, house parent salaries and social work services. Not all cost centers had ceilings. Under this system, which is referred to as a "cost reimbursement system," monthly per–child payments to individual agencies in fiscal 1977 ranged roughly from $300 to $850.

This cost–reimbursement system for payment was changed as a result of the appropriations act for the 1977–79 biennium. In Laws of 1977, 1st Ex. Sess., ch. 339, § 58, the Legislature appropriated a large lump–sum amount for DSHS's Community Social Services Program, of which the child welfare programs are a part. No specific amount of the overall section 58 appropriation was earmarked for the

---

[1]An opinion filed concurrently with this one deals with the appeal from the trial court's judgment on the remainder of the case.

child care services. Section 58, however, did specifically limit departmental expenditures in two respects by a provision which in relevant part reads as follows:

The appropriations contained in this section shall be subject to the following conditions and limitations:

(1) Not more than $5,564,000 . . . shall be expended for an inflationary increase in allowance and vendor rates.

(2) Not more that $1,061,000 . . . shall be expended for an increase in the vendor rate for private child caring agencies: PROVIDED, That these funds shall not be expended until the department has developed a revised system for private child caring agencies which include:

. . .

(b) The classification of facilities according to established program standards;

(c) A reimbursement system which compensates facilities for services provided;

DSHS understood section 58(2) as mandating a payment system based on the type of care being provided by an agency, rather than on the agency's costs, and began working with the agencies to devise a new system. This could not be done immediately, however, so for fiscal 1978, the first year of the biennium, DSHS simply granted each agency a 5.5 percent "inflationary increase" over its previous rate. As a result of this increase, monthly per–child payments to individual agencies during fiscal 1978 ranged from $304 to $919.

In determining how to structure a new payment system for use beginning with fiscal 1979, DSHS looked to the types of services which were being provided, and decided that these services could be classified into three categories, denominated as levels of care 1, 2 and 3. Having done this, DSHS first considered setting a single payment rate for each care level. It then recognized, however, that going immediately to such a single rate per care–level system would result in payment cuts for many agencies which, it was apparently thought, would be inequitable and disruptive. DSHS therefore decided to establish a payment *range*

for care levels 2 and 3: *e.g.,* a minimum of $643 and a maximum of $733 per child per month for agencies providing level 2 care, and a minimum of $804/maximum of $911 for level 3 care agencies.[2] This system of ranges was, to some extent, at least considered by DSHS as a transitional phase in the implementation of the requirement of section 58(2).

Comparing fiscal 1978 rates to those projected using the minimum/maximum rates for 1979, some agencies had been receiving less than the minimum for their particular care level, some had been paid within the projected range, and a few agencies had received payments over the new maximum.

The problem in this appeal arises from the manner in which DSHS did or did not provide for an "inflationary increase" in rates for fiscal 1979. DSHS explains that it considered that it had $11,389,982 available for payments to child care agencies for that year, computed as the sum of $9,735,191 "base expenditure level," plus the increase of $1,061,000 authorized by section 58(2), plus an inflation component of $593,791 (5.5 percent of $9,735,191 plus $1,061,000). DSHS further explains that the $593,791 inflation component was at least in part included in the computations from which it derived the new minimum/maximum ranges described above.

When it came to determining what rates would be paid to specific agencies for fiscal 1979, in light of the new minimum/maximum ranges, what DSHS actually did can be summarized as follows:

(1) Agencies whose fiscal 1978 payments had been *more than* 5.5 percent *below* the 1979 minimums for their care level had their rates of payment increased to the applicable minimum.

(2) All other agencies whose 1978 payments had been *below* the applicable 1979 maximums had their rates raised by 5.5 percent, but with the maximum in the

---

[2]Virtually all the agencies were classified at levels 2 and 3 and it was considered unnecessary to provide a range of payments for level 1 care.

applicable range as an upper limit.

(3) Agencies whose fiscal 1978 payments had already been above the applicable 1979 maximums had their rates "frozen." They received no increases, but neither were their rates decreased to the stated maximums.

The net result of these decisions was that six agencies received no increase (though they continued to be paid at a rate above maximums), and three others received increases of less than 5.5 percent (but up to allowable maximums). The trial court believed that this disparate treatment of the inflationary increment violated the equal protection clause of the United States Constitution or its counterpart in the state constitution.

In reviewing an order of summary judgment, we engage in the same inquiry as the trial court. The critical determination is whether there is a genuine issue as to any material fact *and* whether the moving party was entitled to judgment as a matter of law. *Sarruf v. Miller,* 90 Wn.2d 880, 586 P.2d 466 (1978). We may affirm or reverse the summary judgment of the trial court based on our own resolution of the constitutional issues. *Simpson v. State,* 26 Wn. App. 687, 615 P.2d 1297 (1980). Although the material facts as to how DSHS arrived at the rate structure for fiscal 1979 are undisputed and the equal protection issue was amenable to disposition by summary judgment, we do not agree that the plaintiffs should have been granted summary judgment.

Most often, equal protection cases concern whether state legislation comports with the constitutional mandate. However, the equal protection clause reaches the exercise of state power however manifested, whether exercised directly or through the subdivision of the state and by any of its agents. *Avery v. Midland Cy.,* 390 U.S. 474, 20 L. Ed. 2d 45, 88 S. Ct. 1114 (1968).

The validity of a number of governmental activities is measured against the backdrop of the equal protection clause. These activities include apportionment of a county's districts to insure equal representation of its legislative

body, *Avery v. Midland Cy., supra;* a state welfare department's regulation which establishes a maximum grant of welfare benefits to families irrespective of the number of family members, *Dandridge v. Williams,* 397 U.S. 471, 25 L. Ed. 2d 491, 90 S. Ct. 1153 (1969); a court rule establishing eligibility of applicants to the state bar, *Nielsen v. State Bar Ass'n,* 90 Wn.2d 818, 585 P.2d 1191 (1978). We are satisfied that DSHS's rates for child care agencies must stand the scrutiny of the equal protection clause.

▮ Initially we must determine which test is to be employed in determining whether the classification of agencies for receipt of the "inflationary purpose" funds violates equal protection. We do not utilize a strict scrutiny test since no fundamental rights are involved nor is the classification suspect. Here, all that is required is minimal scrutiny under the rational relationship test. *Yakima Cy. Deputy Sheriff's Ass'n v. Board of Comm'rs,* 92 Wn.2d 831, 835–36, 601 P.2d 936 (1979) outlined the 3–step analysis to be employed in measuring constitutionality of classifications with minimal scrutiny:

> First, does the classification apply alike to all members within the designated class? The answer is usually yes. However, an affirmative answer to this narrow question does not itself mean that the challenged legislative classification will survive minimal scrutiny.
>
> Second, does some basis in reality exist for reasonably distinguishing between those within and without the designated class? More specifically, do reasonable grounds exist to support the classification's distinction between those within and without the class? . . .
>
> Third, does the challenged classification have any rational relation to the purposes of the challenged statute? More specifically, does the difference in treatment between those within and without the designated class serve the purposes intended by the legislation?

(Citations omitted.)

▮ One who challenges the rates established by DSHS on equal protection grounds faces the same presumptions and has the same burdens as one challenging a legislative

enactment on similar grounds. Thus the rates are presumptively valid and the State enjoys a wide range of discretion in making its classifications. The challenger must do more than question the wisdom and expediency of the classification and must conclusively show that the classification is contrary to the legitimate purposes of the state activity.

We hold the plaintiffs have not overcome the presumptive validity of the new rates. Their arguments do little more than question the wisdom and expediency of DSHS's actions by pointing out that some, but not all, agencies received inflationary increases. They have not borne the burden of conclusively showing that the classification of those receiving inflationary increases and those who have not is contrary to legitimate purposes of state activity. Their brief ignores the 3–step analysis from *Yakima Cy. Deputy Sheriff's Ass'n v. Board of Comm'rs, supra,* discussed above.

The 3–step analysis of the minimum scrutiny test to determine constitutionality of the challenged classification satisfies us that equal protection restraints have not been violated. Step one, as is usually the case, is satisfied. The rates apply uniformly to all providers within each classification. All agencies whose prior rates exceed the new maximum rate for their respective level of services received the prior rate. All agencies whose prior rates were below the new maximum level of their respective rates received an increase based on 5.5 percent of the prior rate so long as the increase did not exceed the maximum. All agencies whose prior rates were more than 5.5 percent less than the new minimum rate for their respective level received the new minimum.

The second step in the analysis is also satisfied. A basis does exist for making a reasonable distinction between those within and without the designated class, *i.e.,* between those who receive the additional inflationary increase and

those who do not. We must keep in mind that DSHS was required to classify the agencies' facilities according to program standards and adopt compensatory rates in accordance with the standards. Historically, in a sense, the agencies established their own levels of care and within limits were compensated by DSHS. The difference in services is reflected in the wide range of rates paid to the agencies. The higher levels of care previously provided by some agencies were no longer to be used or required by DSHS. The new rates were adjusted accordingly. To adjust to the new standards, standards mandated by the legislative appropriation, meant that some agencies would modify existing programs. Adjustments upwards or downwards were required as the case may be, in facilities and/or staffing. In the judgment of DSHS, this adjustment could not be accomplished overnight. Fiscal 1979 was considered a transitional phase to reach the standardized services and compensatory scheme required by the Legislature.

In the judgment of DSHS, the adoption of a single rate for each level of service would cause serious financial hardship to some agencies. Time was required to make adjustments in staff and facilities. DSHS obviously did not want to impose rates that were lower than those of previous years, being well aware that costs of operations were then affected by inflation. The combination of the minimum/maximum rate for each level with the use of the "inflationary increase" was the scheme adopted by DSHS to permit the adjustment while still providing rates somewhat related to the older, familiar rates of each agency. Each agency would receive an increase from prior rates so long as the rates did not exceed the maximum for the particular level of care.

Those agencies whose prior rates exceeded the maximum were not given additional increases but neither were their rates lowered. To grant additional increases to these agencies would perpetuate the disparity in rates, something the

Legislature was trying to avoid by a standardized system. In light of the transitional aspects of the rates for fiscal 1979 and the plan to achieve standardized rates for standardized services with a minimum of financial hardship, reasonable grounds exist to support the distinction between those who receive the additional inflationary increment and those who do not.

The plaintiffs have failed to establish conclusively that the classification of those receiving inflationary increases and those who are not is contrary to the legitimate purposes of DSHS. The purpose of this new rate system was to adopt a new standardized rate with a minimum of financial hardship and dislocation of services. The combination of the minimum and maximum rate for each level coupled with the inflationary increase over prior rates has a rational relationship to this objective or purpose, and the third step in the analysis is satisfied.

In reviewing DSHS's actions on equal protection grounds, we do not determine whether DSHS strayed from an ideally perfect classification. It is irrelevant that a better alternative could have been devised. Our only question is whether the challenged classification has a rational basis. We are satisfied that it does.

The trial court having erred in granting summary judgment to the plaintiffs, the judgment below must be reversed. A reversal would result in a remand for further proceedings. As noted above, we determined that the case was subject to disposition by summary judgment. Thus even though the State and DSHS did not move for summary judgment of dismissal, we believe that they as non-moving parties are entitled to a summary judgment of dismissal. *Rubenser v. Felice,* 58 Wn.2d 862, 365 P.2d 320 (1961); 4 L. Orland, Wash. Prac., *Rules Practice* § 5656, at 422 (3d ed. 1983).

Judgment reversed with direction to enter summary

judgment of dismissal in favor of defendants.

PETRIE, J., concurs.
WORSWICK, J., concurs in the result.

Reconsideration denied April 8, 1983.

Review denied by Supreme Court June 3, 1983.