[Nos. 5502–3–II; 6088–4–II.   Division Two.   September 2, 1983.]

UNITED NURSING HOMES, INC., ET AL, *Respondents,* v.
HARLAN McNUTT, *as Secretary of the Depart–
ment of Social and Health Services,*
ET AL, *Appellants.*

UNITED NURSING HOMES, INC., ET AL, *Respondents,* v.
GERALD THOMPSON, *as Secretary of the Depart–
ment of Social and Health Services,*
ET AL, *Appellants.*

WASHINGTON STATE HEALTH FACILITIES ASSOCIATION, ET AL,
*Respondents,* v. THE DEPARTMENT OF SOCIAL AND
HEALTH SERVICES, ET AL, *Appellants.*

*Kenneth O. Eikenberry, Attorney General,* and *Wm. Michael Hanbey, Assistant,* for appellants.

*George Kargianis* and *Mark E. Fortier,* for respondents United Nursing Homes, et al.

*John R. Fox,* for respondents Washington State Health Facilities Association, et al.

WORSWICK, J.—The Department of Social and Health

Services appeals a judgment of the Thurston County Superior Court that declared the rights of the parties and also awarded damages to respondent nursing homes.[1] The nursing homes cross–appeal the trial court's refusal to award attorney's fees. Despite a complicated factual background and a multitude of contentions on appeal, the dispositive issue is whether the trial court erred in interpreting former RCW 74.09.590. We affirm.

■ Although a substantial part of its brief and oral presentation was devoted to arguing the facts, DSHS has not properly assigned error to any of the findings of fact.[2] Therefore, they are verities on appeal. *In re Marriage of Elam,* 97 Wn.2d 811, 650 P.2d 213 (1982). A summary of the findings follows.

The federal medicaid program provides a medical assistance plan for the needy. When a state chooses to participate in the program, it does so by adopting a plan pursuant to 42 U.S.C. §§ 1396 *et seq.* Former RCW 74.09 granted DSHS authority to participate in the medicaid program; it governs the nursing home cost reimbursement system in this case. DSHS implemented the plan by adopting regulations codified in WAC 388–96.

The nursing homes contracted with DSHS to provide care to medicaid patients from January 1, 1978 to June 30, 1979. DSHS set payment rates prospectively for individual nursing homes. New rates were to be set each July 1 and

---

[1]Three cases have been consolidated on appeal: United Nursing Homes, Inc. v. McNutt; United Nursing Homes, Inc. v. Thompson; and Washington State Health Facilities Association v. Washington State Department of Social and Health Services. The trial court entered judgment in McNutt on March 25, 1981. A stipulated judgment was then entered into between the parties in United Nursing Homes, Inc. v. Thompson and Washington State Health Facilities Association v. Washington State Department of Social and Health Services based on collateral estoppel. Only the issues in McNutt will be discussed, although identical issues are involved in each of the three cases.

[2]The Department failed to comply with RAP 10.3(g) which provides in part: "A separate assignment of error for each finding of fact a party contends was improperly made or refused must be included with reference to the finding or proposed finding by number."

adjustments for inflation were to be made each January 1. The reimbursement system purported to predict and reimburse the actual allowable costs the homes would incur during the rate period. At the end of each rate period, DSHS conducted a meticulous audit of nursing home costs. Audited allowable costs did not include frills or extras. Rate payments in excess of the homes' audited allowable costs were recouped by the State. However, any deficit to a nursing home resulting from audited allowable costs exceeding the prospective rate was not reimbursed.

From January 1, 1978 to June 30, 1979, the reimbursement system failed realistically to take into account economic conditions and trends. It did not reimburse the homes for all expense items necessarily incurred to provide federally defined skilled nursing home care. The reimbursement system did not result in the setting of prospective rates at a level that could reasonably be expected to reimburse economically and efficiently operated nursing homes in full for actual allowable costs. DSHS knew of the deficiencies in the prospective ratesetting system, but continued to use it.

Upon these facts, the trial court rendered a declaratory judgment. The court held that former RCW 74.09.590 required DSHS to set prospective rates targeted on reimbursing the nursing homes in full for their actual allowable costs[3] and to make a periodic adjustment of the rates to assure that the targeted goal was realized. The court also held that DSHS had done neither and consequently that the nursing homes had suffered damages. In response to the nursing homes' prayer for damages, it also adopted a formula by which the damages sustained by each home would be determined and awarded. We hold that the trial court

---

[3]Former RCW 74.09 and the applicable regulations used several terms of art to refer to costs. "Actual" costs are costs incurred by the nursing home. An "allowable" cost is ordinary, necessary, related to the provision of skilled nursing care, and of the nature and magnitude that prudent, cost–conscious management would incur. *See* WAC 388–96–501. "Audited allowable" costs are actual allowable costs which survive the auditing process prescribed by WAC 388–96.

did not err.

DSHS contends that Congress intended the states to set prospective rates at a "reasonable" level; those rates then act as a budget within which the nursing homes must operate. It argues that former RCW 74.09.590 must be similarly interpreted in order to entitle the State to federal matching funds. *See* RCW 74.04.055. We disagree.

■ Congress intended the states to reimburse nursing homes in full for reasonable costs actually incurred. Former 42 U.S.C. § 1396a(a)(13)(E) (amended 1981) requires states participating in the medicaid assistance program to provide:

> (E) effective July 1, 1976, for payment of the skilled nursing facility and intermediate care facility services provided under the plan on a reasonable cost related basis, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost–finding methods approved and verified by the Secretary;

The legislative history for this section provided in part:

> The committee bill would require States to reimburse skilled nursing and intermediate care facilities on a reasonable cost–related basis by July 1, 1974. [The year was later changed to 1976.] This approach is preferable to the arbitrary rate–setting currently in effect in some States which provide no incentive to facilities to upgrade the level of care provided. The States would use acceptable cost–finding techniques (not necessarily those utilized for medicare purposes) to determine reasonable reimbursement and apply to the results appropriate methodologies for determining payment. . . . States would be free to provide for retroactive adjustments of rates or costs to the extent necessary to prevent "windfalls" or unjustifiably low payment.

S. Rep. No. 1230, 92d Cong., 2d Sess. 287 (1972). Thus it can be seen that federal law requires states to establish a plan for paying nursing homes their reasonable actual costs. Within that framework, states have discretion to define reasonable costs and to develop appropriate costfinding techniques. The states may also determine how payments

will be made. If prospective payment rates are established for a given period, the plan should provide for retroactive adjustment of rates to prevent windfalls or unjustifiably low payments. If a state chooses to set payment rates prospectively, retroactive adjustment of the rates is essential in order to assure that the homes are paid on a cost–related basis. Washington's plan, as the trial court interpreted it, is consistent with these objectives.

■■ In interpreting statutory language, the court must ascertain and give effect to the intent and purpose of the Legislature, as expressed in the act. *State v. McKim*, 98 Wn.2d 111, 653 P.2d 1040 (1982). Former RCW 74.09.580 provided:

> The nursing home payment system under this chapter shall provide for individually–based or class–based rates which shall be the maximum reimbursement for each nursing home for the period for which the rates are assigned. Operators of nursing homes shall refund all portions of payments received which exceed actual audited costs and all portions of payments received which are attributable to unreasonable or nonallowable costs as determined by federal or state regulations.

Former RCW 74.09.590[4] provided:

Payment rates shall:

---

[4]RCW 74.09.590 was repealed by Laws of 1980, ch. 177, § 90, effective July 1, 1982. Laws of 1981, 1st Ex. Sess., ch. 2, § 26, made the repeal effective July 1, 1981. The Legislature repealed the section when it adopted the Nursing Homes Auditing and Cost Reimbursement Act of 1980. *See* Laws of 1980, ch. 177. Much of the new act will not take effect until July 1, 1984. The new act contains language similar to RCW 74.09.590:

The following principles are inherent in RCW 74.46.430 through 74.46.590:

(1) Reimbursement rates will be set prospectively on a per patient day basis;

(2) Rates will be established not lower than the level which is reasonably expected to be adequate to reimburse in full the actual, allowable costs of a facility which is economically and efficiently operated and to provide care which meets the needs of a medical care recipient in compliance with applicable standards; and

(3) The rates so established will take into account economic conditions and trends during the period to be covered by such rates.

RCW 74.46.420 (added by Laws of 1980, ch. 177, § 42, effective July 1, 1984).

(1) Not be set lower prospectively than the level which may reasonably be expected to reimburse in full for actual allowable costs under federal regulations for a nursing home which is economically and efficiently operated;

(2) Realistically take into account economic conditions and trends during the time period covered by the rates;

(3) Be at least annually redetermined;

(4) Permit as allowable those expenses necessary to meet all items of expense which operators of nursing homes must incur to provide federally defined skilled or intermediate care services;

(5) Meet the reasonable cost of patient assessment activity as required by the department; and

(6) Meet the reasonable cost of accounting requirements.

Reasonable costs shall be determined independently of the level of funding available, in accordance with federal regulations and guidelines.

In our view, the Legislature intended that nursing homes be paid their actual allowable costs because, in (1) and (4), it directed DSHS to set prospective rates at a level reasonably expected to do just that. It also intended retroactive adjustment of rates because, in (2), DSHS is required to consider economic conditions and trends "during the time period covered by the rates". This contemplates that DSHS will raise rates to prevent unjustifiably low payments. Windfalls are prevented by the provision in section .580 for repayment of money exceeding actual audited costs. It is unreasonable and illogical to suggest that the Legislature intended to recapture money from rate payments in excess of actual allowable costs and not reimburse homes for rates that fell below those costs. The trial court's interpretation of former RCW 74.09.590 is consistent with the federal mandate to pay nursing homes on a reasonable cost–related basis. It is also likely to satisfy federal laws entitling Washington to receive federal matching funds. *See* RCW 74.04-.055; *State ex rel. Living Servs., Inc. v. Thompson,* 95

Wn.2d 753, 630 P.2d 925 (1981).[5] *Cf. Washington Ass'n of Child Care Agencies v. Thompson,* 34 Wn. App. 225, 660 P.2d 1124 (1983); *Washington Ass'n of Child Care Agencies v. Thompson,* 34 Wn. App. 235, 660 P.2d 1129 (1983).

DSHS argues with considerable vigor that the trial court's interpretation would open the door to payment of unreasonable costs. It offers, as a horrible example, the hypothetical nursing home which could overspend a reasonable budget by hiring only registered nurses instead of lower paid staff. In this, we believe DSHS reveals that it has fundamentally misperceived the law and its role. The law does not invest DSHS with power to determine nursing home budgets but imposes on it the responsibility of constructing and implementing a system of actual cost reimbursement. At the same time, the law contemplates—and the regulations properly provide—that costs will be kept reasonable because unreasonable costs simply will not be allowed.[6] As for the example, DSHS may refuse to pay all the costs of a home staffed entirely by RN's, not because the home's budget would be unreasonable, but because a private nurse for each patient would not be an allowable cost, *i.e.,* necessary or cost–conscious. *See* former RCW 74.09.590(1); WAC 388–96–501; WAC 388–96–585(2)(a) and (v).

The next contention of DSHS, that the trial court and this court should defer to its expert knowledge in this arcane field, was succinctly answered in *State ex rel. Living Servs., Inc. v. Thompson, supra,* in which the court said "[a]dministrative agencies may not modify or amend a statute by regulation." 95 Wn.2d at 759. The DSHS regulations, to the extent that they purport to create and implement a prospective rate system, are inconsistent with the

---

[5]Although DSHS now disputes this interpretation, it conceded in *State ex rel. Living Servs., Inc. v. Thompson, supra,* that former RCW 74.09.590(1) required the State to reimburse nursing homes in full for their actual allowable costs.

[6]The nursing homes do not dispute the propriety of the various regulations defining costs.

statute.

DSHS next contends the trial court erred in awarding damages in a declaratory judgment action. It claims that the nursing homes, having contracted to provide services for the State, must sue exclusively on the contract if they wish other than declaratory relief. We disagree.

■ Washington has adopted the Uniform Declaratory Judgments Act. *See* RCW 7.24. A person whose rights are affected by a statute may obtain a declaration of rights thereunder. RCW 7.24.020. Further relief based on a declaratory judgment may be granted whenever necessary or proper. *See* RCW 7.24.080; *Ronken v. Board of Cy. Comm'rs,* 89 Wn.2d 304, 572 P.2d 1 (1977). It is generally held, under statutes similar to RCW 7.24, that declaratory and coercive relief may be combined in the same proceeding. Annot., 155 A.L.R. 501, 503 (1945). RCW 7.24 should be similarly construed to effectuate the general purpose of the act: to make uniform the law of those states which enact it. *See* RCW 7.24.140. The trial court has authority to order DSHS to comply with former RCW 74.09.590. *State ex rel. Living Servs., Inc. v. Thompson, supra.* The only purpose of the contract is to bind the homes to provide nursing services and to bind DSHS to pay for those services. The contract cannot provide for payment rates that violate former RCW 74.09.590 or any other statutory authority. *See Hederman v. George,* 35 Wn.2d 357, 212 P.2d 841 (1949). The trial court concluded DSHS misapplied the ratesetting statute and, as a result, the nursing homes were underpaid. Granting damages in the declaratory action saved time and money and resolved the entire dispute. The trial court did not err.

DSHS next contends that, even if damages may be awarded in a declaratory judgment action, the court erred in adopting the damages formula. It claims the damages were based on speculation and conjecture because none of the homes showed specific damage at trial. We disagree.

■ The trial court found the nursing homes were damaged by the State's failure to reimburse in full for actual

allowable costs as required by former RCW 74.09.590. It then ordered audits of each home. If a home's audited allowable costs fall below nursing home pricing in the 93rd percentile, it will be reimbursed in full for those audited allowable costs.[7] Those homes whose audited allowable costs fall in the 93rd percentile or above will be paid at the 92nd percentile level. The percentile placement of the nursing homes is based upon their price structure within the entire industry in Washington. The damages were to be based on meticulous audits and a correct interpretation of the law. The fact that specific damages are not known until audits are completed does not make the damages speculative.

DSHS next contends the court erred in awarding damages to the nursing homes without a showing that each home was economically and efficiently operated. This contention has no force because these factors are taken into account in the trial court's formula for determining damages.

Former RCW 74.09.590(1) does provide that only economically and efficiently operated homes may be reimbursed in full for actual allowable costs. However, the damages formula reimburses only economically and efficiently operated homes. The formula allows the nursing homes their full *audited* allowable costs up to the 93rd percentile. The audit process, implemented through department regulations, incorporates concepts of economy and efficiency. WAC 388-96-210 provides in part:

(2) auditors will examine the contractor's financial and statistical records to verify that:

(a) Supporting records are in agreement with reported data;

(b) Only those expense items the department has specified as allowable costs have been included by the contractor in computing the costs of services provided

---

[7]The nursing homes did not appeal the trial court's decision to impose a ceiling on payments at the 93rd percentile. We express no opinion on that part of the court's decision.

under its contract;

(c) Allowable costs have been accurately determined and are necessary, ordinary and related to patient care; and

(d) Recipient trust funds have been properly maintained.

Former WAC 388–96–501 defines allowable costs:

Allowable costs are documented costs which are necessary, ordinary and related to the provision of SNF [skilled nursing facility] or ICF [intermediate care facility] services to nursing home patients, and are not expressly declared nonallowable by applicable regulations. Costs are ordinary if they are of the nature and magnitude which prudent and cost–conscious management would pay.

Auditors must disallow reported expenses not adequately documented in the home's financial records. WAC 388–96–213. The documentation must show that the costs were incurred and that they were related to patient care. These procedures, incorporated into the damages formula, insure that the nursing homes will not be paid more than an economical and efficiently operated home.

As an overall safeguard, we expect the trial court to afford the parties a further hearing after the dollar amounts have been computed by the court's formula but before final judgment is entered.

Finally, we have considered additional contentions by DSHS concerning claimed procedural errors and find them without merit.

■ The nursing homes contend the trial court erred in not awarding them attorney's fees. We disagree. Attorney's fees may not be awarded as part of the cost of litigation in the absence of a contract, statute, or recognized ground in equity. *Crane Towing, Inc. v. Gorton,* 89 Wn.2d 161, 176, 570 P.2d 428, 97 A.L.R.3d 482 (1977). The nursing homes acknowledge they have no contractual or statutory right to attorney's fees. They rely, instead, on the equitable common benefit/common fund theory. This theory requires the litigation to benefit others as well as the litigant and to

preserve or create a common fund. *Crane,* 89 Wn.2d at 176–77. The common fund must be an immediate fund from which attorney's fees may be awarded at trial. *Seattle Sch. Dist. 1 v. State,* 90 Wn.2d 476, 585 P.2d 71 (1978). The effect of this litigation may well benefit other nursing homes in the state. However, it did not create a presently existing common fund at trial from which reasonable attorney's fees could be awarded. *See also State ex rel. Living Servs., Inc. v. Thompson,* 95 Wn.2d at 760.

Affirmed. Remanded for further proceedings consistent with this opinion.

PETRICH, C.J., and REED, J., concur.

Reconsideration denied September 28, 1983.

Review denied by Supreme Court December 2, 1983.